WILLIAM NELSON, A PETITIONER IN BANKRUPTCY, *v.* DANIEL CAR-
LAND, AN OPPOSING CREDITOR.

Upon questions adjourned from the District to the Circuit Court under the "Act
to establish a uniform system of bankruptcy throughout the United States,"
the district judge cannot sit' as a member of the Circuit Court, and, conse-
quently, the points adjourned cannot be brought before this court by a certi-
ficate of division.

Nor will an appeal or writ of error lie from the decision of the Circuit Court;
and it is conclusive upon the district judge.

THE case came up on a certificate of division in opinion be-
tween the judges of the Circuit Court of the United States for
the district of Kentucky. The facts are set forth in the opinion
of the court.

Mr. Chief Justice TANEY delivered the opinion of the court.

In the case of William Nelson, petitioner in bankruptcy in the
Kentucky district, against Daniel Carland, an opposing creditor,
several points were adjourned by the District to the Circuit Court.
Upon the hearing in the last-mentioned court, the district judge,
as well as the justice of the Supreme Court, sat in the case; and
being opposed in opinion upon the questions adjourned, they
were certified to this court upon the motion of the counsel for
the petitioner.

The first question that presents itself upon this certificate is,
whether the Supreme Court have jurisdiction in the matter in
this form of proceeding. And after examining the printed argu-
ment filed by the counsel for the petitioner, and carefully con-
sidering the subject, the court are of opinion that the district
judge cannot sit as a member of the Circuit Court, upon ques-
tions adjourned to that court, under the "Act to establish a uni-
form system of bankruptcy throughout the United States;" and
that, consequently, the points adjourned cannot be brought before
this court by a certificate of division. Nor will an appeal or
writ of error lie from the decision of the Circuit Court; and it is
conclusive upon the district judge.

In delivering the opinion of the court, it is, however, proper
for me to say, that I dissent from that part of it which excludes

the district judge from sitting as a member of the Circuit Court in a case of this description. Yet I concur in the judgment dismissing these proceedings; being of opinion that the act of Congress of 1802, authorizing the certificate of division where the judges of the Circuit Court are opposed in opinion, does not apply to the peculiar and summary jurisdiction directed to be exercised in cases of bankruptcy.

The proceedings must therefore be dismissed for want of jurisdiction.

Mr. Justice CATRON dissented.

On a petition for a discharge, the district judge adjourned into the Circuit Court the question—Whether the act of 1841, establishing a uniform system of bankruptcy, was constitutional, or otherwise. The judges were divided in opinion on the question, and a certificate of division was made to the Supreme Court; calling upon this court to decide the question, and return it so decided, to be entered as the judgment of the Circuit Court.

The district judge may adjourn into the Circuit Court any question, whether he has, or has not, doubts regarding its decision. Its importance is a sufficient reason. That he properly adjourned the question, whether the bankrupt law was or was not constitutional, is free from doubt. Of this question, the Circuit Court had full and proper jurisdiction; and the decision of it would have been conclusive of the case before us.

Was it a "question" on which the judges could divide in opinion?

The act of April 29, 1802, provides: "That whenever any question shall occur before a Circuit Court, upon which the opinion of the judges shall be opposed, the point upon which the disagreement shall happen, shall during the same term, upon the request of either party, or their counsel, be stated under the direction of the judges, and certified under the seal of the court, to the Supreme Court, at their next session to be held thereafter; and shall, by the said court, be finally decided. And the decision of the Supreme Court, and their order in the premises, shall be remitted to the Circuit Court, and be there entered of record, and shall have effect according to the nature of the said judgment and order: Provided, That nothing herein contained

shall prevent the cause from proceeding, if, in the opinion of the court, further proceedings can be had without prejudice to the merits."

The act declares, when any "question shall occur before the Circuit Court," &c., then, on a division, a certificate shall be made at the request of either party. No matter in what form of proceeding it occurs, be it at law or in equity; divisions are nearly as frequent in causes in equity as at law. Under the bankrupt law, the proceedings are in the form prescribed to courts of equity.

Now, "did a question occur," in the Circuit Court? It must be admitted that one of the gravest occurred that could be presented to a court of justice: there it was to be decided, and the case concluded by its decision. The judges were opposed, and it could not be decided: then it was their duty, at the request of either party, to send it to this court, to decide for the Circuit Court; where the decision of the Supreme Court is to be entered as the judgment of the Circuit Court.

So far the case presented, seems to be sufficiently clear: but it is met by another consideration; and that is, whether the Circuit Court, in a question adjourned under the 6th section of the bankrupt law, consists of the two judges, or of the circuit judge only. In all other cases, in the Circuit Courts of the United States, except in writs of error and appeals from the District Court to the Circuit Court, (an exception made by positive legislation;) the two judges have equal powers—they constitute the Circuit Court usually; and must do so when a division takes place: does the bankrupt law cut off these powers of the district judge? The law does not so provide; and can it be justly inferred? If the district judge cannot be a member of the court on the hearing of the adjourned question, then no division of course can take place. To come at the inference of his exclusion, the intention of Congress must be ascertained from the whole scope of the act.

Great questions were involved in its construction. It was to be administered by more than thirty judges, acting separately; no appeal to the Circuit Court was allowed, save in a single case: that of a refusal to finally discharge the bankrupt from his debts, (sec. 4;) and then the Circuit Court is commanded, if the bankrupt shall be found entitled to the benefits of the act, "to make a

decree of discharge, and grant a certificate, as provided in this act." No appeal is allowed to this court from the decree of the Circuit Court: the creditor is not allowed an appeal, either from the District Court to the Circuit Court, or to the Supreme Court, in any case. Nor is the debtor allowed an appeal from the decree of the Circuit Court, refusing his discharge. Such is the unanimous opinion of my brethren now present; and with which opinion I concur. If the discharge is objected to by the creditors, and the District Court refuses it, the debtor may then demand a trial by jury, and try the matter over again: if the jury decides against him also, he may then appeal to the Circuit Court, and there elect to submit the matter a third time, either to the court, or to another jury; and this finding is conclusive, whether by the court or a jury. It is not possible, therefore, to reach this court by appeal, in a bankrupt case. This is clear; and my brethren think it equally clear, that no adjourned question can be brought here by a division of opinion: it follows, this court has no revising power over the numerous and conflicting constructions of the bankrupt law. In some circuits it is held, that one indebted "in consequence of a defalcation as a public officer; or as executor, or administrator, guardian, or trustee; or while acting in any other fiduciary capacity," can be discharged from all his other debts; and that the less favoured creditors may take all his property, unless the government, ward, &c., see proper to come in for distribution; when the fiduciary claim will also be extinguished. In other circuits, those indebted to any amount in a fiduciary capacity are all excluded as a class: the fact appearing on the face of the petition, it is dismissed of course. Such is the construction of the act in the eighth circuit; it has excluded from applying great numbers in the eighth and other circuits, who would have been admitted had they applied in circuits where the law is construed otherwise. This question also has been brought here by a division of opinion from the district of Kentucky, at the instance of the district and circuit judges, acting together as the Circuit Court; the question having been adjourned into that court by the district judge.

In the case of William Nelson, the question occurred in the same court, whether the bankrupt law was unconstitutional and void, or otherwise. It was adjourned, as already stated, into the

Nelson v. Carland.

Circuit Court by the district judge; and there the judges were opposed in opinion, and certified the question to this court for its decision. This was done at the instance of the bar of St. Louis; the district judge of Missouri having pronounced the bankrupt act a mere insolvent law; such as was never contemplated by the framers of the Constitution, and therefore void. The following are some of his reasons for entertaining this opinion:

" Is this act of Congress, under which the petitioner claims a discharge from his debts, authorized by the Constitution?' In order to determine this, it will be necessary to notice several of its provisions.

" It provides, in substance, that any person, whether a trader or not, who is indebted, except in a few enumerated cases, may file his petition in the District Court of the United States, for the benefit of the act, at any time he may please, without the consent or action of any of his creditors, and obtain by a decree of the court, a discharge from all his debts. This decree is to be had without the consent of any of his creditors being required, even if they do not participate in the proceedings or receive a dividend from the property. The decree is to be deemed a full and complete discharge from all his debts, contracts, and engagements, proveable under the act, whether contracted before or after the passage of the act. If he has property, he surrenders it; if he has none, it is the same thing as it regards his discharge.

" In examining this question, we should ascertain, if possible, what was the object the convention had in view by inserting the provision. The phraseology adopted would indicate a part of the object: ' To establish uniform laws on the subject of bankruptcies throughout the United States.' It was apprehended, at least, that they would not be uniform, unless Congress had the power to make them so. In addition to this, we are told by Mr. Madison (Fed. No. 42) that ' the power of establishing uniform laws of bankruptcy, is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different states, that the expediency of it seems not likely to be drawn into question.' To have a system that would be uniform and would prevent frauds, &c., seems to have been the object. The proposition was

z 2

referred to the committee of detail, of which Mr. Rutledge was chairman, and reported as it now stands in the Constitution. In ascertaining what were the mischiefs to be remedied or the objects to be effected, the convention, doubtless, looked to the condition of things, and of course to the institutions and laws of the various states. But for a definition of that or any other legal term, or to ascertain the nature and extent of the powers they were about to grant, by particular words or phrases, they would hardly look to the laws of the states. There was far less intercourse in those days than at present. There were no steamboats, railroads, or Macadamized roads.

" The laws of the several states could not have been generally known to the members of the convention from the different states; even the best lawyers could not have been acquainted with the laws of the states in which they did not practise. They are not so, even at this day. If they had been acquainted with the laws of all the states, to which would they have referred in preference to all the rest, for definitions, or the meaning and extent of legal terms? The convention well knew it was making a Constitution for the whole Union; that the terms they might use should be known and understood, and must be interpreted and explained in every state. They were, therefore, exceedingly exact in the use of words and phrases: every word of legal import, every phrase was weighed and considered; and a phrase of only a few words was frequently referred to a committee, as was done in this case, and examined and reported on. They were frequently obliged to use legal terms; they were making a law; this was a legal term—bankrupt laws: what was to be done to prevent confusion and uncertainty? and, above all, to mark exactly and with legal precision the extent of the powers they were about to grant, that neither more nor less power might be granted than was desired?

" Our ancestors had removed from England; the United States had then lately been English colonies and part of the British empire. The English laws and system of jurisprudence had been substantially adopted in every state in the Union. Every person at all conversant with legal subjects, and every lawyer of course, was acquainted with the English laws. This know-

Nelson v. Carland.

ledge was equally extensive in every state. It is so to this day. Here, then, was a law with which all were acquainted, and to which all could refer. There could be no mistake, if reference was made to it for the meaning of terms. And to it they did accordingly refer. We do so to this day. Ask a lawyer the meaning of a legal term, and where does he look for an answer? To the statutes of Massachusetts or Georgia—New York, Pennsylvania, or Virginia? Certainly not. In most instances he would look in vain.

"The proposition in regard to bankruptcies was made by Mr. Charles Pinkney, of South Carolina, in the words we now find in the Constitution. It was referred to the committee of detail, consisting of Mr. Rutledge of South Carolina, Mr. Randolph of Virginia, Mr. Gorham of Massachusetts, Mr. Ellsworth of Connecticut, and Mr. Wilson of Pennsylvania; and they reported it in the words in which it was referred. Now, several of these states never had any thing like a bankrupt law. To which then did they refer, or could they refer, to ascertain the meaning and extent of the terms they were employing? The lawyer, if he is not familiar with the term, will refer to Blackstone's Commentaries, or to an English Law Dictionary, where he will readily find it. If he referred to the statutes of the different states, he might get as many definitions as there were states, supposing they had any law on the subject.

"The first Continental Congress, in 1774, declared, among other things, 'that the respective colonies were entitled to the benefit of such of the English statutes as existed at the time of their colonization, and which they had, by experience, found to be applicable to their several local and other circumstances.' 1 Journal of Congress, 28, Phila. ed. of 1800.

"Many of the states had adopted, in a body, the English statutes, only excepting such as were local to that kingdom, or not applicable to their situation.

"The Supreme Court of the United States, in Patterson v. Winn, 5 Peters, 233, say, that 'the English statutes passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constituted a part of the common law of the country.'

"We know, as matter of history, that the members of the con-

vention who took part in debate, were intimately acquainted with the English laws.    The committee above mentioned possessed several of the most eminent lawyers in America, and who have held the highest legal stations.    Reference was often made by them to the English laws for the meaning of terms or phrases they were using.    Thus, when it was proposed to define and limit treason against the United States, Mr. Randolph and Mr. Ellsworth, (two of the committee,) Mr. Madison, Mr. Mason, and Mr. Gouverneur Morris, all referred to the act of Parliament of 25th Edward 3d; and the convention, at last, adopted the precise phraseology of that act. Madison Papers, 1770.    Again, when the phrase '*ex post facto*' was under consideration, Mr. Dickerson stated that, on examining Blackstone's Commentaries, he found the term related to criminal cases only. Mad. Pap. 1450. And the Supreme Court has since confirmed the signification of the terms to the definition given by Blackstone.    Mr. Hamilton, who was a member of the convention, in speaking of the '*Habeas Corpus*' provision in the Constitution, refers to, and quotes, Blackstone's Commentaries.  Fed. No. 84.

This general principle being established, we may go a step further, and show that, in point of fact, the convention had the English statutes in view, in determining the nature and extent of the power they were granting to Congress, when the bankrupt clause was under consideration.

"Mr. Sherman observed 'that bankruptcies were, in some cases punishable with death by the laws of England, and he did not choose to grant a power, by which that might be done here.' 3 Mad. Pap. 1481.    It thus appears, that the law of England were the laws referred to in regard to the definition and nature of the powers they were conferring.

"It may also be remarked, that Blackstone's Commentaries were in the hands of the members, and frequently referred to. This book contained a definition of a bankrupt, and a summary of the English laws on the subject.    What then was the English law to which the convention referred when they adopted the clause in regard to bankrupts ?    The English system, when the convention sat, had been in operation for several generations; and provided, in substance, a proceeding by a creditor against a debtor, who was a trader; distribution of bankrupt's effects

equally among his creditors; a discharge to be obtained by the debtor from his debts, upon obtaining the consent of a given majority of his creditors.

"It was a proceeding for the benefit of creditors, as are all laws for the collection of debts, of which this was one; but with liberality towards the debtor, who, by misfortunes so frequently attending trade, became unable to pay his debts, in allowing him a discharge from those debts, upon obtaining the consent thereto of a given majority of his creditors. Even this provision for a discharge, we are told by Blackstone, was intended for the benefit of creditors, as it influenced debtors to act with economy, industry, and honesty, and make a full surrender of their property, without which they could not hope to obtain the consent of their creditors.

"The whole system was founded on the principle, that a trader, who owed debts in various parts of the country, and was fraudulently making way with his property, instead of paying his debts with it, should have that property taken away and placed in the hands of trustees or other officers, with which his debts should be paid, and each of his creditors, whether absent or present, have his fair dividend.

"We are told by Mr. Madison, who has, not inaptly, been called the Father of the Constitution, that a uniform system of bankruptcy 'would prevent so many frauds, when the parties, or their property, may lie or be removed into different states, that the expediency of it seems not likely to be drawn in question.' Fed. No. 42. This reason for the adoption of the clause in regard to bankrupts was published by Mr. Madison after the Constitution was proposed by the convention, but before it was adopted by the states; was intended to explain the grant of power to Congress, and to induce the states to accept the Constitution; and no doubt had its effect. The frauds of whom—the removal of whose property, are here spoken of? Certainly the frauds of the debtor—the property of the debtor.

"We have another almost contemporaneous exposition of this grant of power to Congress. It is the act of Congress of 1800, 'To establish a uniform system of bankruptcy throughout the United States.' It is altogether, in its principle and material features, like the English system; a proceeding by creditors against debtors who are traders; distribution of bankrupt's effects

equally among creditors; a discharge of the bankrupt from his debts, on the consent obtained of a given majority of his creditors.

"I have now, I think, shown that the bankrupt system intended by the framers of the Constitution, and to establish which, power was given to Congress, was a system for the benefit of creditors, to enable them to collect their just debts, and to prevent the frauds of debtors who might remove their property and themselves into different states.

"I will now show that the act we are considering is solely and entirely for the benefit of debtors, and to enable them to avoid their debts; and therefore opposed to the whole intent, spirit, and object of a bankrupt law. For this purpose I will here further notice some of its provisions.

"1. The debtor selects his own time to commence proceedings—when he may have entirely squandered his property, and when nothing can be found. It is not even necessary that he should have been sued, or threatened with a suit, or ever asked for the debt.

"2. He is allowed to select the state and county where he will commence proceedings. For this purpose he can change his residence or business to any place he may think most favourable. He can thus go where nobody is likely to detect his frauds.

"3. He may have spent all his property in idleness, riotous living, debauchery, or gambling, in stocks, or wild speculations: it will not affect him; and he is entitled to his discharge, equally with the most prudent, industrious, and economical person.

"4. If he does not surrender to his creditors one cent's worth of property, he may have property reserved to him, to the amount of $300, for his own use; and also his wearing apparel, and that of his family, which has been held, by some, to include jewelry.

"5. If a majority of his creditors should object to his discharge, it will only give him an additional privilege—that of demanding a jury, and taking the cause away from the court. Or he may appeal, even before the cause is tried, and is allowed ten days to appeal in. No such privileges are given to creditors.

"6. After the court disposes of the matter, or decides the cause against him, and refuses the discharge, he can then have it referred to a jury, although already tried and decided by the court,

which, heretofore, has never been allowed in any case, either in law or equity.   The creditor is allowed no such privilege.

" 7. In such cases, no provision is made by the act to allow the creditors a trial by jury.

" 8. An appeal is given to the debtor—none is allowed by the act to a creditor.

" 9. When the cause is removed into the appellate court, the debtor can demand either a trial by jury or a trial by the court. The creditor has no such privilege.

" 10. The debtor may take the chance of a decision in his favour by the court; if in his favour, it will be conclusive.   If the court decides against him, then he may demand a jury, and have another chance.   If the court decides against him, he can have another chance by appeal.   In the appellate court, if he thinks the court is likely, from previous decision, to be against him, he can take the chance of a jury.   If he thinks the jury is likely to be against him, he can take his chance with the court. If some of these chances do not hit, there is no ' uncertainty in the law.'   The creditor has no choice ; any decision against him is to be final, and scarcely any in his favour is allowed to be final or conclusive.

" 11. The English bankrupt law and the act of 1800 gave the appointment of the assignee to the creditors, because they alone were interested.   No such privilege is given by this act.

" 12. The commissioner is to be appointed in the county where the bankrupt lives.

" 13. There is no punishment for frauds.

" 14. To conclude, the debtor is to get a discharge from all his debts, without the consent of any creditor.   It applies to debts contracted before the passage of the act, and of which creditors could have had no idea at the time they gave the credit.

" May I not here inquire, whether it is fair to construe thi" grant of power, intended for the benefit of creditors, and to enable them to collect their just debts, so as to authorize the passage of a law solely for the benefit of debtors, and to enable them to avoid and discharge their debts?

" Again : a clause had been introduced into the Constitution, prohibiting the states from passing any law impairing the obligation of contracts, because, as was said by the members of the

convention, it was immoral, contrary to the first principles of justice, and a power that ought not to be exercised by any legislative body. Would the states have ratified the Constitution, and submitted to such a prohibition on themselves, for such reasons, if they had understood that Congress could, at its pleasure, under colour of bankrupt laws, authorize the abrogation of all contracts?"

Pursuant to the opinion, decrees were entered, dismissing the first cases presented for final discharges in the district of Missouri; and some twelve hundred more, depending in that court, will be dismissed, unless the decrees are reversed which have been entered. It was thought, by the circuit judge, due to the county at large, and to the parties concerned, that this important question should meet with the speedy decision of this court; and therefore it was brought here.

No law that Congress ever passed, has in it to a greater degree, the elements of various construction and confusion, than the bankrupt law of 1841, when administered by more than thirty judges, acting separately; if all are exempt from the revising power of this tribunal, created for the purpose (amongst others) of producing uniformity of decision and construction in all cases over which its jurisdiction extends.

I think Congress intended, by the 6th section of the bankrupt law, to give the district judge the power to adjourn questions into the Circuit Court, 1. For the purpose of obtaining the aid and assistance of the circuit judge; and, 2. To make up a division of opinion on great questions, so that the decision of the Supreme Court might be had. This was contemplated by Congress; or it was intended that in no bankrupt case should this court have a revising power, although in every district in the United States the law might be differently construed: and the wildest prediction could hardly have exceeded the reality. So far from being "a uniform system of bankruptcy," in its administration, it has become, by the various and conflicting constructions put upon it, little more uniform than the different and conflicting state insolvent laws. This result could not have escaped those who passed the law; it was too prominently manifest to be overlooked; I cannot, therefore, bring my mind to the belief that the revising power of this court was intended to be cut off. And, as the most expeditious and convenient mode o. revision was by

a division of opinion, I think Congress intended that should be the mode. Notwithstanding the question was sent to this court, the case might progress below at the election of the district court; so the recited act of 1802 provides; and then the creditor and debtor would have equal opportunities to redress a perverted construction. But, as the matter now stands, the remedy is with Congress, either to give this court jurisdiction, or to withhold it.

### ORDER:

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Kentucky, and on the points and questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that this cause be and the same is hereby dismissed, for the want of jurisdiction, and that this cause be and the same is hereby remanded to the said Circuit Court, for such proceedings to be had therein as to law and justice may appertain.

---

While this volume was in press, we received the following opinion delivered by Judge Catron in his judicial district, which we insert as being of general interest.

### IN THE MATTER OF EDWARD KLEIN.

This is an appeal from the District Court of Missouri, in a case of bankruptcy, on the voluntary petition of the appellant, to be discharged from his debts, on the surrender of his property, according to the act of Congress of 1841. The proceeding being in all respects regular, the petitioner moved for his discharge: the District Court refused to grant such motion, "because it considered the act of Congress under which said Klein asked to be discharged from all his debts, as being against the Constitution of the United States; and therefore the court had no power to grant such discharge."

The ground of this judgment the Circuit Court is called upon to revise. I am relieved from setting forth at any length the opinion of the district judge, because this has been already done, in an opinion delivered by me in the Supreme Court of the United States at its last term, when an attempt was made to bring the present question before that court to have it decided for the purposes of this case.

By the Constitution, Congress is vested with power "to establish uniform laws on the subject of bankruptcies throughout the United States." The district judge was of opinion, that the extent of the power is limited to the principle on which the English bankrupt system was founded; and to that system

the convention referred, when it adopted the clause above recited, for its defini-tion. That system provided, a proceeding by a creditor against a debtor who was a trader; a distribution of a bankrupt's effects equally among his creditors; and a discharge of the debtor from his contracts upon obtaining the consent of a given majority of his creditors. That it was a proceeding for the benefit of creditors; the whole system being founded on the principle that a trader who owed debts in various parts of the country, and was fraudulently making away with his property, instead of paying his debts with it, should have the property taken away and placed in the hands of trustees or other officers, with which his debts should be paid; and each of his creditors, whether present or absent, have his fair dividend; and that the bankrupt law of 1800, is a fair ex-position of the constitutional provision.

Briefly: That a bankrupt law, was one, by which honest creditors could force fraudulent debtors, who were traders, to surrender all their property, to pay rateably all their just debts: but that a law made solely and entirely for the be-nefit of debtors, and which enabled them at their own election, to avoid their debts, was opposed to the whole intent, spirit, and object of a bankrupt law.

I state thus much of the grounds on which my brother judge's decree was founded from his printed opinion, because this case has not been argued on part of the creditors; for whom no counsel appeared in this court, nor did there in the court below, as I am informed. The accuracy, industry, and unques-tioned ability of the district judge, have, I do not doubt, brought forward the best reasons that exist, in support of the judgment he gave. The tenor, and true spirit, of the English bankrupt laws, such as they were when our Federal Constitution was adopted, he has given; and I agree with him, that the act of 1841, in so far as it permitted the debtor at his own sole election, to come into court and coerce an extinction of his debts, and abrogation of his contracts, contrary to the will of his creditors, was in violation of the leading principles on which the English laws were founded. Our law contemplated a proceeding by a debtor against his creditors; provided the debtor was insolvent: by the English law, the creditor alone could originate the proceeding; and it mattered not, whether the defendant was insolvent or otherwise; if he did the fraudulent act, it made him a bankrupt—a fraudulent trader. Then by the English laws, " a fraudulent trader" could only be a bankrupt; with him as debtor; and with his creditors, could courts deal; and this at the election of the creditors—the debtor, having no election to ask for distribution or for a discharge from his debts. If the power conferred on Congress, carries with it these restrictions, then the District Court properly refused to discharge the applicant Klein, be-cause the act of Congress was unconstitutional in his case. But other and controlling considerations enter into the construction of the power: it is gene-ral and unlimited, it gives the unrestricted authority to Congress over the entire subject, as the Parliament of Great Britain had it; and as the sovereign states of this Union had it before the time when the Constitution was adopted. To go no further: what was the power of the states on the subject of bankruptcies? They could, and constantly did, permit the debtor to come involuntarily and surrender his property, and ask a discharge from his debts; the property was distributed generally among the creditors, and the debts of the petitioner an-

nulled. Nor does the Constitution prohibit the states from passing such laws; New York, Pennsylvania, Louisiana, and others, now have them in full operation. The insolvent laws of Pennsylvania are in substance, and to a great extent in detail, similar to the act of Congress of 1841; and no doubt furnished some of the ideas that were incorporated into the act. That Pennsylvania had power to pass these laws, no one ever doubted, so far as she was not restricted by the Constitution of the United States. The Supreme Court held, in the case of Ogden v. Saunders, 12 Wheat. 213, that the states retained the power and could exercise it by law, and that the law would operate to discharge the contract between debtor and creditor; they being inhabitants of the particular state at the date of the proceeding, if the contract had been made there after passing the law. In such case the parties contracted subject to the law, and it entered into the contract. The case of Boyle v. Zacharie and Turner, 6 Peters, 635, settled the contested question of power; and that it remained with the states to this limited extent. But the restrictions depend on general principles of international law, and other parts of the Constitution; especially that, which prohibits the states from passing any law impairing the obligations of contracts; as will be seen by reference to the leading case on the subject, of Sturges v. Crowninshield, 4 Wheat. 122. What the states might do before the adoption of the Constitution, may well be ascertained, from what they now do in virtue of their respective powers. They may frame a bankrupt law in any form they see proper; this has never been questioned so far as my knowledge extends. The controversies in the Supreme Court turned on the question, whether the Constitution inhibited the states (there being no acts of Congress opposed to it) from legislating on the subject of bankruptcies; or, whether the power was exclusive in Congress. In the state tribunals the debtor comes involuntarily, and forces the creditor to prove his debt or be barred. One not a trader may apply: neither is the consent of the creditors (or any portion of them) necessary to authorize a discharge from the contracts of the debtor. So he may have no property to divide, and many debts to annul, from which he seeks a discharge, and from which he is discharged. These powers clearly belonged to the state governments, before Congress was invested with them; and this was done without limitation.

The District Court relied confidently on the ground, that Congress can pass no law violating contracts; and that the clause of the Constitution conferred no such authority, because the English bankrupt laws, by which the power is supposed to be restricted, only permitted the contract to be annulled at the election of four parts in five of the creditors in number and value; and therefore they annulled it by a new contract. This argument proceeds on the assumption, that a proceeding in bankruptcy can only be had, at the election of, and for the benefit of creditors; and that every material step, is their joint act; to which the debtor is compelled to submit. For the present it will only be necessary to say, that one prominent reason, why the power is given to Congress, was to secure to the people of the United States, as one people, a uniform law, by which a debtor might be discharged from the obligation of his contracts; and his future acquisitions exempted from his previous engagements: that the rights of debtor and creditor, equally entered into the mind of the framers of the

Constitution. The great object was to deprive the states of the dangerous power to abolish debts. Few provisions in the Constitution have had more beficial consequences than this; and the kindred inhibition on the states, that they should pass no law impairing the obligation of contracts.

The inhabitants of states producing largely, must be creditors; the inhabitants of those that are consumers, will be debtors; bankrupt laws of the latter states might ruin the producers and creditors; they having no interest or power in the government of the consuming states, and it being the interest of the latter to annul the debts of non-residents, no remedy would exist for the grossest oppression. No laws of relief would be more effectual in times of pressure by foreign creditors; nor more likely to be adopted. If one state adopted such a measure, it would furnish a fair occasion for others to do the same, on the plausible pretext of self-defence; others would be forced into a similar bad policy, until discredit and ruin would overspread the entire land, by an extinction of all debts; and a consequent prostration of morals, public and private, on the subject of contracts. This evil had to a certain extent occurred, and was fresh in the minds of the framers of the Constitution; and no doubt it would again occur in some of the states, but for the provisions under consideration standing in the way, of abrogating the private contracts of non-residents.

But if Congress passed the law, it must be uniform throughout the United States, then the entire people are equally represented, and have the power to protect themselves against hasty and mistaken legislation, by its repeal, if found oppressive in practice.

Legislation by Congress on the subject of bankruptcies, is of much less consequence, than its prohibition on part of the states. They can pass no law affecting a non-resident, because no jurisdiction exists of his person; they can impair no contract made out of the state, because it was not made subject to the state insolvent law. The power, as it stands restricted by the decision in Ogden *v.* Saunders, is almost harmless; those whom the state bankrupt law can most affect, have the popular vote in the state legislature, and may repeal the law; the foreigner has little interest in its existence, as he cannot be affected by it, further than that the debtor may be deprived of his property. Another reason why Congress was vested with the power, was to prevent dangerous conflicts of jurisdiction among the states. A discharge in one sovereignty from contracts, is by the laws of nations not recognised as a discharge in another sovereignty, save on the grounds of comity; an assignee under the British bankrupt laws, is not recognised in this country as owner of the debts of the bankrupt; and an attaching creditor, or the government may disregard a title set up by the foreign assignee. Harrison *v.* Sterry, 5. Cranch, 298. The states in this respect are foreign to each other, and would be little likely to extend comity to the discharge of each others; from which great confusion might follow, and much ill will.

In considering the question before me, I have not pretended to give a definition; (but purposely avoided any attempt to define) the mere word, BANKRUPTCY. It is employed in the Constitution in the plural, and as part of an expression; " the subject of bankruptcies." The ideas attached to the word in this connection, are numerous and complicated; they form a subject, of exten-

In re Castleman.

sive and complicated legislation; of this subject, Congress has general jurisdiction; and the true inquiry is—To what limits is that jurisdiction restricted?

I hold, it extends to all cases where the law causes to be distributed, the property of the debtor among his creditors: this is its least limit. Its greatest, is a discharge of the debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject —distribution and discharge—are in the competency and discretion of Congress.

With the policy of a law, letting in all classes, others as well as traders; and permitting the bankrupt to come in voluntarily, and be discharged without the consent of his creditors, the courts have no concern; it belongs to the law-makers.

I have spoken of state bankrupt laws. I deem every state law, a bankrupt law, in substance and fact, that causes to be distributed by a tribunal, the property of a debtor among his creditors; and if is especially such, if it causes the debtor to be discharged from his contracts, within the limits prescribed by the case of Ogden v. Saunders. Such a law may be denominated an insolvent law; still it deals directly with the subject of bankruptcies, and is a bankrupt law, in the sense of the Constitution; and if Congress should pass a similar law, it would suspend the state law, while the act of Congress continued in force.

This court deeming the act of 1841, constitutional, it is ordered, that the decree of the District Court dismissing the proceeding be reversed, and the petitioner, Klein, be discharged from his debts, and receive his certificate. The same order is directed in the case of Christopher Rhodes; dismissed also on constitutional grounds by the District Court.