In re Clyde S. BARTLETT, Jr., Debtor.

**GENERAL MOTORS ACCEPTANCE CORP., Plaintiff,**

v.

**Clyde S. BARTLETT, Jr., Defendant.**

**Bankruptcy No. 91–11691.
Adv. No. 91–1166.**

United States Bankruptcy Court,
D. New Hampshire.

Nov. 2, 1993.

Jennifer Rood, Backus, Meyer and Solomon, Manchester, NH, Andrew Schwartz, and Vincent Canzoneri, Foley, Hoag & Eliot, Boston, MA, for GMAC, plaintiff.

Andrew Volinsky, Shaheen, Cappiello, Stein & Gordon, P.A., Concord, NH, for Clyde S. Bartlett, Jr., defendant.

Karen Forbes, pro se.

Jeffrey Schreiber, Schreiber & Associates, Danvers, MA, Trustee.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding came on for hearing before the Court on October 12, 1993 on plaintiff's Motion for Default Judgment and defendant's Objection thereto, concerning plaintiff's Complaint and Amended Complaint to Determine Dischargeability of Debt. The motion for default judgment is based upon the debtor/defendant's asserted failure to comply with an order compelling production of certain documents, entered on July 22, 1993, with the debtor again refusing to produce any documents on the grounds of possible self-incrimination. For the reasons set forth below, the Court grants plaintiff's Motion for Default Judgment.

This case presents the question left open and unnecessary to the decision in the *Fairbanks* [1] case, i.e., whether a debtor can invoke the Fifth Amendment in a voluntary bankruptcy proceeding in which he is seeking a discharge and, concomitantly, block an objecting creditor from obtaining relevant documents necessary for a trial on the question of dischargeability without in effect facing a default judgment against himself for failure to comply with appropriate production requests.

In the *Fairbanks* case, the trustee was seeking the production of records relevant to the administration of the case and the acquisition of information about assets and liabilities so that he could liquidate the assets and determine claims leading to a distribution to creditors. In the present case, a creditor is seeking the production of documents so that it can effectuate its right to object to the dischargeability of its debt under section 523 of the Bankruptcy Code.

Plaintiff, General Motors Acceptance Corporation ("GMAC"), a creditor of the debtor-defendant, Clyde S. Bartlett, Jr. ("Mr. Bartlett"), seeks a determination of nondischargeability of its claim of approximately $1,014,-290.27 due to Mr. Bartlett's alleged tortious conversion, fraudulent diversion and/or embezzlement of funds that GMAC had advanced as secured "floor plan" loans to Mr. Bartlett's car dealership, Clyde Bartlett Buick–BMW, Inc. (the "dealership"), which is also in bankruptcy.[2]

GMAC claims that under the so-called "floor plan" financing arrangement between GMAC and the dealership, GMAC made advances to the dealership to fund the dealership's purchases of cars for its inventory. GMAC states that until each car was sold, the dealership was to keep the car on its lot, physically available to GMAC as collateral, and upon sale of each car the dealership was to repay GMAC the amount advanced for that car. Instead, GMAC avers that Mr. Bartlett used the dealership to convert and embezzle GMAC funds by retaining sale proceeds that were due to GMAC on account of cars that GMAC had financed. GMAC further claims that Mr. Bartlett diverted and embezzled GMAC funds by failing to purchase cars with funds advanced by GMAC for that purpose. GMAC requests that the Court hold Mr. Bartlett personally liable for these debts of the dealership, and that the Court determine these debts to be nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). GMAC further requests the Court to award multiple damages and attorneys fees pursuant to N.H. RSA 358–A:2 and 10.

Mr. Bartlett responds that GMAC knowingly and purposefully allowed the dealership to utilize "out of trust" funds as working capital to keep the dealership open, and that GMAC continued to offer substantial "floor plan" financing to the dealership when it was aware of the declining nature of the business. Mr. Bartlett further responds that, although the dealership may not have been able to immediately reimburse GMAC for any monies due them, he personally had the funds to repay GMAC.

Mr. Bartlett's personal bankruptcy case has been pending in this Court for over two years, during which time GMAC has consistently and unsuccessfully sought to obtain copies of corporate and personal documents in Mr. Bartlett's possession or control, including his personal financial records.

---

**1.** *In re Fairbanks,* 135 B.R. 717 (Bankr.D.N.H. 1991).

**2.** *In re Clyde Bartlett Buick–BMW, Inc.,* BK No. 91–10385, Chapter 7 (D.N.H.).

GMAC has been thwarted from its discovery efforts at every juncture, primarily by Mr. Bartlett's assertion of his Fifth Amendment privilege against self-incrimination. Below is a chronology of GMAC's discovery attempts.

*Chronology*

Mr. Bartlett filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 5, 1991, and GMAC initiated this adversary proceeding approximately four months thereafter, on October 3, 1991. On October 31, 1991, GMAC served its "First Request for Production of Documents" on Mr. Bartlett. *See Plaintiff's Motion to Compel Production of Documents by defendant Clyde S. Bartlett, Jr.,* Exhibit A (filed June 29, 1992) (Adv.Pro.Ct.Doc.No. 17). The comprehensive "First Request" primarily focussed upon the production of any and all records concerning financial transactions of any kind involving Mr. Bartlett, Mrs. Bartlett, any member of the Bartlett family, the dealership, or the dealership's agents—both in Mr. Bartlett's individual capacity and concerning his business, the dealership—in order to determine what transfers of assets and liabilities had occurred between Mr. Bartlett, the dealership, and others, and whether Mr. Bartlett had the ability, as he claimed, to repay GMAC for "floor-plan financing" funds Mr. Bartlett had used personally.[3]

As indicated by the non-exhaustive summary of requested documents in footnote 3 above, Mr. Bartlett's failure to produce these documents would seriously curtail if not thoroughly impede any creditor's, or for that matter, any trustee's, ability to proceed with a section 523 action in a chapter 7 proceeding. Mr. Bartlett responded to GMAC's request for production of documents with a one-and-a-half page document in which he states that the request is "overly broad" and "burdensome", and in which he then makes a blanket assertion of his rights under the Fifth Amendment to the United States Constitution. *See Response to Request for Production of Documents* (filed Dec. 4, 1991) (AP Ct.Doc. No. 5).

The Court subsequently held two pretrial hearings, on January 9, 1992 and on April 27, 1992, and continued this matter for oral argument on December 7, 1992 on a motion for summary judgment that GMAC would be filing regarding the Fifth Amendment issue. On May 19, 1992, subsequent to the April 1992 pretrial hearing, GMAC's attorney sent a letter to Mr. Bartlett's attorney in an attempt to resolve the parties' differences with regard to the document request. *See Plaintiff's Motion to Compel Production of Documents by Defendant Clyde S. Bartlett, Jr.,* Exhibit C (filed June 29, 1992) (AP Ct.Doc. No. 17).

During this period, GMAC also sought to depose John M. Maroney, the secretary-treasurer and "keeper of the records" for the dealership. The deposition was set for June 11, 1992, but on June 8th and 9th the attorney for GMAC received facsimile-transmitted letters from the attorney for the dealership indicating that neither he nor Mr. Maroney or Mr. Maroney's personal attorney nor Mr. Bartlett or his personal attorney would be attending the deposition. *See Plaintiff's Motion for an Order Holding Clyde Bartlett Buick–BMW, Inc. in Contempt of Court,* Exhibit C (filed June 29, 1992) (AP Ct.Doc. No. 18). No one appeared at the scheduled deposition on behalf of Mr. Bartlett or the dealership or Mr. Maroney.

---

3. More specifically, the requested financial records pertaining to Mr. Bartlett, Mrs. Bartlett, the Bartlett family, the dealership, and/or the dealership's agents included documents concerning:

Purchases, potential purchases, or attempts to obtain financing for purchases of vehicles from other dealerships; Communications among the above-referenced persons/entities, or between them and GMAC; Communications between the above-referenced persons/entities and any other person or entity regarding financing for or investment in the dealership; Purchases, sales, or transfers of any real estate at any time; Ownership, leasehold, or other property interest of any interest in the dealership; Any guaranty or payment to any creditor of the dealership; Employment of Mr. or Mrs. Bartlett by the dealership or any other entity; Credit cards used by Mr. or Mrs. Bartlett; Payments, transfers, loans, or advances by or to the dealership and/or by or to Bartlett family members; Federal and state income tax returns; Bank statements, cancelled checks, applications, and other records concerning any bank accounts; Personal vehicles; Gambling debts; and Debts from the purchase of antiques.

On June 29, 1992, reacting to Mr. Bartlett's and the dealership's non-compliance with discovery attempts, GMAC sought intervention from this Court. *See Plaintiff's Motion to Compel Production of Documents by Defendant Clyde S. Bartlett, Jr.,* (filed June 29, 1992) (AP Ct.Doc. No. 17), and *Plaintiff's Motion for an Order Holding Clyde Bartlett Buick–BMW, Inc. in Contempt of Court,* (filed June 29, 1992) (AP Ct.Doc. No. 18). Mr. Bartlett objected to the Motion to Compel, in which he again asserted his Fifth Amendment privilege, although he stated that "Mr. Bartlett, however, will abide by appropriate orders of this Court" and that "Defendant must await the order of this Court with respect to this discovery request", thereby giving the impression that he would comply with any discovery order that I might issue. *See Objection to Plaintiff's Motion to Compel Production of Documents by Defendant Clyde S. Bartlett, Jr.,* pp. 2 at ¶ 3, 5 at ¶ 14 (filed July 8, 1992) (AP Ct.Doc. No. 22).

On September 3, 1992, I held a hearing on GMAC's Motion to Compel and deferred ruling thereon pending oral argument on GMAC's motion for summary judgment on December 7, 1992. *See Proceeding Memo* (dated and filed September 3, 1992). Thereafter, this matter came on for oral argument on GMAC's motion for summary judgment, which I denied by an Order and a Memorandum Opinion issued on May 14, 1993. *See In re Bartlett,* 154 B.R. 827 (Bankr.D.N.H.1993) (Memorandum Opinion), and *Order on Motion for Summary Judgment* (filed and dated May 14, 1993) (Ct.Doc. No. 58).

On July 15, 1993, this matter came before the Court for a further pretrial hearing, at which time I considered and granted GMAC's Motion to Compel Production of Documents. *See Order Compelling Production of Documents* (dated July 20, 1993 and filed July 22, 1993) (AP Ct.Doc. No. 62). Mr. Bartlett was ordered to produce to GMAC the documents requested in paragraphs 3 through 16 of GMAC's "First Request for Production of Documents" on or before August 20, 1993. *Id.; see also* discussion of the requested documents *supra* at page 75 and in footnote 3 of this Opinion.

At the hearing on July 15, 1993, I indicated that there may be certain documents that Mr. Bartlett would not find to be potentially incriminating to produce, and that he should therefore respond to the request of GMAC with particularity to each item requested and indicate to which items he was asserting his constitutional privilege. *See Transcript of Continued Hearing on Motion to Compel Production of Documents,* p. 13 (filed Oct. 6, 1993) ("It is not impossible that if he wants a discharge and makes his judgment as to the dangers of incrimination as to a particular document or item that he may waive the privilege because there's no serious danger of incrimination from that particular item.") With this in mind, I expressly stated that "[b]lanket assertions of the privilege are not appropriate", "[n]o blanket assertions [of] privilege", and that "[t]he plaintiff has a right to know what [Mr. Bartlett's] talking about, and therefore I think the motion should be granted." *Id.* pp. 13, 17.

Mr. Bartlett's response to this Order was one paragraph:

> "NOW COMES the Debtor, Clyde S. Bartlett, Jr., and respectfully asserts all of his rights and privileges under the Fifth Amendment of the United States Constitution to each and every paragraph of GMAC's Motion to Compel production of Documents by Defendant Clyde S. Bartlett, Jr. dated June 26, 1992."

*Response to Court Order Dated July 20, 1993* (filed August 19, 1993) (AP Ct.Doc. No. 64). It is in reaction to ·this response by Mr. Bartlett to the Court's Order mandating him to comply with GMAC's document requests 3 through 16, as discussed more fully at page 75 and footnote 3 of this Opinion, *supra,* that GMAC filed the present Motion for Judgment by Default (AP Ct.Doc. No. 68).

### Discussion

There are two primary objectives in a chapter 7 bankruptcy proceeding: (1) Liquidation of assets and determination of liabilities so that creditors may get a dividend; and (2) determination of whether a debtor is entitled to a discharge of his obligations and a fresh start in the future.

The United States Supreme Court has repeatedly noted that it is the "honest but unfortunate" debtor for which bankruptcy is designed to provide relief from pre-existing debts and a fresh start in life. *See, e.g., Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), *quoting Williams v. U.S. Fidelity & G. Co.*, 236 U.S. 549, 554–555, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915) (emphasis omitted) ("One of the primary purposes of the bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.' This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."), *Brown v. Felsen*, 442 U.S. 127, 128, 99 S.Ct. 2205, 2207, 60 L.Ed.2d 767 (1979), and *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *see also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 125, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6086 ("The purpose of straight bankruptcy ... is to obtain a fresh start, free from creditor harassment and free from worries and pressures of too much debt.")

In furtherance of these fundamental principles of relief and fresh start, the discharge proceeding is one of the most important aspects of the bankruptcy process. *See* 11 U.S.C. § 727 (All debts are generally dischargeable unless specifically excepted by the Bankruptcy Code.); S.Rep. No. 989, 95th Cong., 2d Sess. p. 98 (1978), U.S.Code Cong. & Admin.News 1978, p. 5884 (Discharge is "the heart of the fresh start provisions of the bankruptcy law."); *see also In re Lederman*, 140 B.R. 49, 52 (Bankr.E.D.N.Y.1992) (citing *Community National Bank v. Persky*, 134 B.R. 81, 96 (Bankr.E.D.N.Y.1991) (citing *In re Klein*, reported in *Nelson v. Carland*, 42 U.S. (1 How.) 265, 11 L.Ed. 126 (1843), and *In re Central Funding Corp.*, 75 F.2d 256, 260 (2d Cir.1935)) ("Distribution and dis-

charge are at the heart of the bankruptcy process.") As such, the determination as to whether or not a debt is dischargeable is as much a matter of administration of the bankruptcy estate as is the liquidation and distribution of assets, which was the subject of the *Fairbanks* case.

That being so, the Court discerns no essential difference between the issue presented in this case and the issue presented in the *Fairbanks* case. In *In re Fairbanks*, 135 B.R. 717 (Bankr.D.N.H.1991), incorporated herein by reference, I held, *inter alia*, that the involuntary chapter 7 debtor there involved could have been compelled to produce any business records in his possession, notwithstanding the possibly incriminating nature of such production, and I accordingly directed the attorneys for the involuntary (and absent) debtor to turn over the documents requested by the chapter 7 trustee. *Id.* As I explained in *Fairbanks*:

> [T]here are some regulatory disclosure requirements in modern society that have to be complied with even though there may in fact be some incidental incriminating effects upon the party required to comply— provided that the regulatory requirements in question are strictly noncriminal in nature and have general applicability throughout the society.

> \*   \*   \*   \*   \*   \*

> [T]he ability to invoke the [Fifth Amendment] privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement.

> \*   \*   \*   \*   \*   \*

> Under chapter 7 of the Code there is a statutory liquidation procedure of general applicability which depends upon, and requires full disclosure by the debtors involved in such proceedings.... [L]iquidation of business cases under chapter 7 of the Code would be severely hampered, if not rendered impossible, were the bankruptcy debtor able to withhold from the trustee the books and records of the business on grounds of possible incriminatory effects as to certain of those records.

*Id.* at 730, 731, 733, *quoting Baltimore City Dept. of Social Serv. v. Bouknight,* 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990) (citing *California v. Byers,* 402 U.S. 424, 427–28, 430, 91 S.Ct. 1535, 1537–38, 1539, 29 L.Ed.2d 9 (1971)); *see also United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (rejecting Fifth Amendment objection to requirement to file income tax return).  I also noted in *Fairbanks,* in dicta, that "It certainly would be an irrational spectacle to have an individual come into the bankruptcy courts and obtain a discharge from his liabilities without ever disclosing his assets on the grounds of self-incrimination." *Id.* at 733.

A similar sentiment was also expressed by the United States Court of Appeals for the First Circuit in *In re Tully,* 818 F.2d 106 (1st Cir.1987):

> "[T]he statutes [of the Bankruptcy Code] are designed to insure [sic] that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.  As we have stated, '[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure.' Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight."

*Id.* at 110, *quoting Matter of Mascolo,* 505 F.2d 274, 278 (1st Cir.1974) (citations omitted).  *See also In re Fekos,* 148 B.R. 10, 12 (Bankr.W.D.Pa.1992) (citations omitted) ("A bankruptcy case may be dismissed when the trustee is unable to administer the estate.") In this proceeding, as in *Fairbanks,* "... the disclosure is required as part of a noncriminal statutory scheme for administration of bankruptcy estates which requires such disclosure for [determination of the dischargeability of debts] ... and in no sense is aimed particularly at prospective criminal defendants." *Fairbanks,* 135 B.R. at 732.

■ A discharge in bankruptcy is not a constitutional right.  *See e.g. Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (citing *United States v. Kras,* 409 U.S. 434, 445–446, 93 S.Ct. 631, 637–38, 34 L.Ed.2d 626 (1973)) ("We have previously held that a debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy."); *Matter of Metzgar,* 127 B.R. 708 (Bankr.M.D.Fla.1991); *In re Save More Foods, Inc.,* 96 B.R. 1 (D.D.C.1989); *In re Connelly,* 59 B.R. 421, 448 (Bankr.N.D.Ill. 1986); and *In re McDonald,* 25 B.R. 186, 189 (Bankr.N.D.Ohio 1982).  The *Metzgar* Court explained:

> While a debtor is entitled to invoke his fifth amendment right to refuse responses in a bankruptcy proceeding ... a discharge in bankruptcy is neither an inherent nor a constitutional right. ... The bankruptcy court can dismiss, *sua sponte,* a petition that cannot be administered due to a debtor's refusal to provide information. ... Requiring him to choose between the benefits of discharge and the costs of self-incrimination does not necessitate forfeiture of one constitutional right to secure another since only the latter stems from the Constitution. ... A debtor seeking relief from his obligations pursuant to the Bankruptcy Code and in a Bankruptcy Court does so willingly and voluntarily and is not entitled to as much consideration in being compelled to testify as would be another witness who had no interest in the proceeding.

*Matter of Metzgar, supra,* at 711, *quoting Scarfia v. Holiday Bank,* 129 B.R. 671 (M.D.Fla.1990) (citations omitted).

An issue identical to the proceeding *sub judice* was recently presented to the Bankruptcy Court for the Eastern District of New York.  *See In re Lederman,* 140 B.R. 49 (Bankr.E.D.N.Y.1992).  In *Lederman,* the court, relying on the reasoning in *Fairbanks,* held that a debtor-defendant in a section 523 adversary proceeding may not avoid producing documents by relying on his Fifth Amendment privilege against self-incrimination.  *Id.*  The Court explained:

> We believe that a debtor cannot enjoy the benefits of the bankruptcy process while avoiding its burdens.  Any other approach would produce an unlevel playing field tilted in the debtor's favor.

"The adversary proceedings brought under § 523 and § 727 of the Bankruptcy Code seek to deny the debtor discharge or except debts from discharge. The debtor cannot use the bankruptcy court to broaden the benefits afforded to an accused by the Fifth Amendment. To do so would allow the debtor to use the Fifth Amendment as a shield, while impermissibly using the Bankruptcy Code as a sword with which to take an unfair advantage of creditors."

*Id.* at 53, *quoting Piperi v. Gutierrez (In re Piperi)*, 137 B.R. 644, 647 (Bankr.S.D.Tex. 1991). As aptly stated by plaintiff herein, "[T]he choice between protection from prosecution and protection from particular creditors is one the debtor must make." *Plaintiff's Memorandum of Law in Response to January 13, 1992 Pretrial Order*, ADV No. 91–1166, p. 8 (filed February 27, 1992) (AP Ct.Doc. No. 15).

▮ Moreover, even if I were to find that debtor was justified in asserting his Fifth Amendment privilege against self-incrimination, I could only do so after the debtor produced, for the Court's consideration, a meaningful, articulation of the reasons why particular requested documents would tend to incriminate him. *See e.g. California v. Byers*, 402 U.S. 424, 429, 91 S.Ct. 1535, 1538, 29 L.Ed.2d 9 (1971), *citing United States v. Sullivan*, 274 U.S. 259, 263–64, 47 S.Ct. 607, 607, 71 L.Ed. 1037 (1927) ("In order to invoke the privilege it is necessary to show that the compelled disclosures will themselves confront the claimant with 'substantial hazards of self-incrimination'."); *In re Ross*, 156 B.R. 272 (Bankr.D.Idaho 1993) (In granting chapter 7 trustee's motion to compel turnover of business records and answers to certain questions in statement of affairs and schedules, Court held in part that debtors could not assert their Fifth Amendment privilege on a blanket basis.); and *Matter of Metzgar*, 127 B.R. 708, 711 (Bankr.M.D.Fla. 1991) (The court, in granting summary judgment against debtors, held that, "To properly invoke the Fifth Amendment privilege, Debtors must produce, for the Court, credible reasons why their answers would tend to incriminate them.")

In *United States v. Sullivan*, the Supreme Court, in rejecting the defendant's assertion that the filing of his income tax return constituted a violation of his Fifth Amendment privilege against self-incrimination, declared:

But if the defendant desired to test that or any other point he should have tested it in the return so that it could be passed upon. He could not draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law.

*Id.* at 264, 47 S.Ct. at 607. "The [person asserting the Fifth] is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified ..." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951), *citing Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951).

### Conclusion

▮ In accordance with the foregoing, this Court concludes that a voluntary chapter 7 debtor is required to produce documents necessary to the trial of an objection to the discharge of a particular debt under Section 523 of the Bankruptcy Code, notwithstanding any incidental incriminating effect of such production, if said debtor wishes to pursue and obtain the discharge of the debt in question by virtue of his bankruptcy filing.

The debtor was present at the hearing on the motion for entry of default judgment. Through counsel, the debtor stated that if he has to produce the documents to avoid having default judgment entered against him he still will refuse to produce by invoking his Fifth Amendment privilege. Accordingly, and since no purpose would be served by any further delay in resolving this adversary proceeding, a separate Order in accordance with this Memorandum Opinion shall be entered granting the plaintiff's motion for entry of a default judgment.