**In re John C. FAIRBANKS, Debtor.**

**Bankruptcy No. 89–10904.**

United States Bankruptcy Court,
D. New Hampshire.

Dec. 20, 1991.

Victor Dahar, Manchester, N.H., for trustee.

Paul Barbadoro, Concord, N.H., formerly representing debtor in criminal cases.

J. Christopher Marshall, McLane, Graf, Manchester, N.H., formerly representing debtor in civil cases.

U.S. Trustee, Boston, Mass.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

Judge Fairbanks, the involuntary bankruptcy debtor herein, has followed Judge Crater into the mists of the unknown.[1] Before leaving, he delivered to his attorneys his books and records from his part-time law practice, including his office records, cash receipts/disbursements journal, and records of various bank accounts and other assets arguably unknown to the trustee in bankruptcy in this case. Since he was also indicted, on the eve of his departure, on various grounds of fraud and embezzlement in dealing with the funds of his clients in his law practice, his attorneys have opposed the efforts of the trustee to obtain those records. The attorneys refuse to produce the records on grounds of privilege even though the trustee contends he needs them so that he can liquidate any additional assets, pursue any recoveries of voidable transfers suggested by the records heretofore unavailable to the trustee, and then distribute the proceeds to Judge Fairbanks' creditors.

The attorneys assert the attorney-client privilege on behalf of their erstwhile client.[2] The Trustee counters that the

---

**1.** See *Unsolved Mysteries*, National Broadcasting Company, October 9, 1991.

**2.** The attorneys earlier moved to withdraw from representing the debtor on grounds that they could no longer properly represent him by vir-

books and records have become property of the estate by operation of law and that even if the debtor were still here and had possession of them he could not prevent the trustee from taking possession of the same as necessary to administer the estate under the bankruptcy laws. This is true says the trustee even though the books and records may include incriminating matters implicating the Fifth Amendment.[3]

The trustee cites a series of Supreme Court decisions to that effect in the bankruptcy context. See *Matter of Harris,* 221 U.S. 274, 31 S.Ct. 557, 55 L.Ed. 732 (1911); *Johnson v. United States,* 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913); *Ex parte Fuller,* 262 U.S. 91, 43 S.Ct. 496, 67 L.Ed. 881 (1923). The attorneys counter that those early cases were based on "property right" concepts that no longer obtain in Fifth Amendment jurisprudence, as reflected in later decisions (at least by the lower courts) in developing that jurisprudence.

This Court believes that the continuing vitality of the *Harris–Johnson–Fuller* line of decisions must be considered in the context of the Supreme Court's 1990 decision in *Baltimore City Dept. of Social Services v. Bouknight,* 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990), holding that a mother could be compelled to produce her child (whose whereabouts were unknown) notwithstanding conceded self-incriminatory aspects of that compelled action, due to suspected child abuse and other factors, where the "production is required as part of a noncriminal regulatory regime." 110 S.Ct. at 905. The Supreme Court in *Bouknight* cited with approval and quoted from its earlier *Harris* decision in support of this proposition. 110 S.Ct. at 906.

The *Bouknight* decision clearly indicates that *Harris* and its progeny are not as dead as some have argued. The issue remains however as to the proper application of these decisions to the facts of the present case. Moreover, the complex interrelationships between the attorney-client privilege and the Fifth Amendment presented by this case deserve careful examination by virtue of the important public policies supporting both privileges.

## KEY FACTS

1. On September 27, 1989, an involuntary case was filed against the debtor.

2. On October 31, 1989, an ex parte motion to join as co-petitioners in creditors' petition in the involuntary case was filed.

3. On October 31, 1989, an order for relief was entered.

4. On November 30, 1989, the trustee was appointed.

5. On December 5, 1989, a hearing on an order to show cause why the case should not be dismissed for failure to file schedules was held. The Court decided not to dismiss the case. Debtor's counsel at that time indicated the debtor would assert a Fifth Amendment privilege against discovery but the debtor was not present personally to assert the privilege. The Court refused to accept the assertion of the privilege by counsel.

6. On December 28, 1989, an indictment of the debtor was handed down on counts of embezzling clients' funds and appropriating those funds to his personal use by the Sullivan County Grand Jury. An arrest warrant was issued that day for the debtor but he could not be located.

7. On December 29, 1989, the Court ordered a Rule 2004 exam of the debtor be held on January 29, 1990, to develop information as to the claims against the estate and as to any assets that might be liquidated to pay creditors.

8. On January 18, 1990, the debtor's attorneys, McLane, Graf, Raulerson & Middleton filed a motion to withdraw and stated as grounds in part: "McLane is unable

---

tue of his disappearance. That motion was granted on March 5, 1990.

**3.** The debtor's Fifth Amendment right against compelled self-incrimination applies with equal force against the states through the due process clause of the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *see also Duncan v. Louisiana,* 391 U.S. 145, 148 nn. 4–13, 88 S.Ct. 1444, 1447 nn. 4–13, 20 L.Ed.2d 491 (1968).

to locate Mr. Fairbanks and it has no way to contact him."

9. The debtor did not appear for his Rule 2004 exam.

10. On February 12, 1990, the Court held a hearing on debtor counsel's motion to withdraw. An objecting party claimed that documents of the debtor held by debtor's counsel should be turned over prior to permitted withdrawal. The Court continued the hearing but ordered debtor's counsel to file a disclosure of its fee arrangement and a list of documents claimed to be subject to the attorney-client privilege. Debtor's counsel complied. The latter list was filed under seal for inspection by the Court alone pending ruling on the asserted privilege.

11. The list filed by counsel describes various documents separated into "Financial Transaction Records" and "Documents of Title" categories. The actual documents themselves have not been produced. Disclosure of the list alone however would arguably violate the privilege since neither the attorneys nor this Court can know whether the trustee independently is aware of the various accounts or other transactions listed. It was for this reason that the Court directed that the listing be filed under seal until this Court could rule on the asserted privilege.

12. Without breaching the privilege at the outset, certain general facts about the documents in question can be set forth that are pertinent to the Court's decision upon the pending matter. The "Financial Transaction Records" include account statements, cancelled checks, and check registers with regard to various depository and other accounts that may or may not be known to the trustee; a cash receipts/disbursements journal for the law office from January 1980 to May 1989; general accounts ledger for the law office from January 1973 to May 1989; copies of miscellaneous checks including cashiers checks; and various other business records with regard to the debtor's activities which need not be further described at this time. The "Documents of Title" category includes various title certificates and related documents and correspondence involving personal property items which will not be further described; two cancelled passbooks from a depository institution that may or may not be known to the trustee; jewelry appraisals; instructions regarding the combination of a home safe; and miscellaneous insurance documents.

13. Without further disclosing the detail of the records in question it is clear that the records being withheld by the attorneys are business records of the debtor that a trustee in bankruptcy normally would be entitled to take possession of, and would obviously do so, in order to properly administer the bankruptcy estate.

14. It is also reasonably certain that at least some of the records could form a link in the chain of evidence necessary in the pending criminal proceeding and to that extent could incriminate the debtor. It is also probable that some of the records would have no incriminating effect. The debtor of course is not here to draw a line between the two.

15. On March 5, 1990, the court permitted debtor's counsel to unconditionally withdraw.

16. On January 3, 1991, the trustee filed a motion for turnover of the business record documents from the McLane firm. That firm, besides representing the debtor in the bankruptcy proceedings, represented the debtor in the closing of his law practice, his resignation as Newport District Judge, the defense of various civil lawsuits, and the defense of an investigation by the Professional Conduct Committee of the New Hampshire Bar Association. The Motion was heard on March 1, 1991 and the Court directed further briefing on the legal issues presented and subsequently took the matter under advisement. The Court's independent research has developed a number of additional relevant case decisions not briefed by the parties.

17. The debtor's whereabouts continue to this day to be a mystery.

## LEGAL DISCUSSION/CONCLUSION

### A. Assertion of Fifth Amendment Privilege

■ Initially, it must be stated that respondent law firm has conceded that it is

not entitled to assert the Fifth Amendment privilege of the debtor. This is not surprising since the First Circuit has made it clear that an attorney cannot assert that privilege on behalf of a client. See *In re Grand Jury Proceedings,* 760 F.2d 26 (1st Cir.1985).[4]

It is worth noting that the one reported bankruptcy decision involving a trustee's attempt to obtain documents from a debtor's attorney, where the Fifth Amendment privilege of the debtor was claimed, held squarely that no First Amendment privilege existed as to the documents. *In re Carter,* 62 B.R. 1007, 1010–11 (Bankr. C.D.Cal.1986) (but giving respondents "one last opportunity" to invoke attorney-client privilege). Other bankruptcy cases have come close to holding the same. See *In re Boileau,* 736 F.2d 503, 506 (9th Cir.1984); *In re Standard Financial Management Corp.,* 77 B.R. 324, 327 (Bankr.D.Mass. 1987) (principal of corporation could not claim Fifth Amendment privilege since that "is a personal right ... and does not stretch to documents or items in the hands of others."); see also *In re Kroh,* 80 B.R. 488, 490–91 (Bankr.W.D.Mo.1987) (trustee could get documents held by accountant over debtor's claim of Fifth Amendment privilege).

■  Respondent's argument is that under the holding of *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), when a person has a Fifth Amendment privilege and transfers documents to his or her attorney then the documents are privileged from discovery under the attorney-client privilege if the act of production itself would be "testimonial" in nature. This is a fair reading of *Fisher.* See *In re Carter, supra.* See also *United States v. Porter,* 557 F.Supp. 703, 707–8 (N.D.Ill. 1982), *rev'd on other grounds,* 711 F.2d 1397 (7th Cir.1983).

Before turning to the question of who holds the attorney client privilege, I must first ask if the *Fisher* case applies here because this debtor cannot *now* assert the

Fifth Amendment privilege since he is not present to do so. A close reading of *Fisher* however indicates that one only looks to the ability of the claimed privilege holder to assert the privilege when that holder was in possession of the documents. The literal language of *Fisher* focused on "whether the documents could have been obtained by summons addressed to the taxpayer while the documents were in his possession." *Id.* 425 U.S. at 405, 96 S.Ct. at 1578. Also, the reasoning of *Fisher* supports this conclusion. The Court explained:

As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice. However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege. [citations omitted] This Court and the lower courts have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice. [citations omitted]. The purpose of the privilege requires no broader rule. Pre-existing documents obtainable from the client are not appreciably easier to obtain from the attorney after transfer to him. Thus, even absent the attorney-client privilege, clients will not be discouraged from disclosing the documents to the attorney, and their ability to obtain informed legal advice will remain unfettered. It is otherwise if the documents are not obtainable by subpoena *duces*

---

4.  At least one other Circuit has agreed. See *In re Grand Jury Proceedings,* 722 F.2d 303, 308

(6th Cir.1983).

*tecum* or summons while in the exclusive possession of the client, for the client will then be reluctant to transfer possession to the lawyer unless the documents are also privileged in the latter's hands. Where the transfer is made for the purpose of obtaining legal advice, the purposes of the attorney-client privilege would be defeated unless the privilege is applicable. "It follows, then, that *when the client himself would be privileged* from production of the document, either as a party at common law ... or as exempt from self-incrimination, the attorney having possession of the document is not bound to produce." 8 Wigmore § 2307, p. 592.

*Id.* at 403–04, 96 S.Ct. at 1577.

### B. Assertion of Attorney–Client Privilege; Waiver

■ The law is clear in the First Circuit that the attorney-client privilege "continues after termination of the lawyer-client relationship." *Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984). The law is also clear that "the privilege belongs to and may be waived only by the former client; the attorney may not terminate the privilege unilaterally. DR4–101(B)(1)." *Id.* at 850. Waiver can be either express, *United States v. Wilson,* 798 F.2d 509 (1st Cir.1986), or implied, *Greater Newburyport Clamshell Alliance v. Public Serv. Co. of New Hampshire,* 838 F.2d 13 (1st Cir.1988).

In this case, respondent maintains that the attorney-client privilege exists even after "death" and accordingly cannot be considered to be waived here by the debtor's absence (and possible death) anymore than it could be waived by a known "dead" person. They rely on the Charles Stuart case, *Matter of John Doe Grand Jury Investigation,* 408 Mass. 480, 562 N.E.2d 69 (1990). I believe they have misread that case. That case held that an attorney could not disclose after the client's death

confidential information received from the client because there was no waiver by the holder of the privilege, which was the administrator of the client's estate, and alternatively because on the facts of that case the court believed the privilege should not be overridden by society's competing interest in discovering the truth about certain matters. Thus, the Massachusetts case is inapposite because the proper holder of the privilege asserted the privilege and would not waive it and the competing interest was not deemed of sufficient magnitude.[5] When the issue *has* been directly presented it has been held that an executor or administrator of a deceased client may in fact waive the attorney-client privilege when necessary for the administration of the estate. See *Brooks v. Holden,* 175 Mass. 137, 141–42, 55 N.E. 802 (Mass.1900).

■ In the present case I believe the proper holder of the privilege is the trustee. This Court has not been made aware of any executor of any estate, and the respondent attorneys do not hold the privilege—they merely have the ethical obligation not to unilaterally terminate it. Under the unique facts of this case, I believe the trustee holds the privilege.

The landmark case on who holds the attorney-client privilege in bankruptcy is *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). That case held that the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications. The Court made this ruling because the trustee, with his extensive powers in bankruptcy, is more similar to the persons who hold the attorney-client privilege outside of bankruptcy, i.e., the management of a corporation. Interestingly, the Court found objectionable the notion that where management had wrongfully diverted or appropriated corporate assets "it could use the privilege

---

5. However, the Court noted that the attorney-client privilege would not stand in the way of compelling disclosure of a conversation between an attorney and their client when that conversation may have related to a proposed or

continuing crime. The Court noted that no legitimate interest of the client or the public would be served by the rule preserving secrecy of this kind of communication.

as a shield against the trustee's efforts to identify those assets." *Id.* at 353, 105 S.Ct. at 1993.[6] The Court did not directly decide whether the holding also applies to individuals. The Court stated:

> [R]espondents maintain that the result we reach today would also apply to *individuals* in bankruptcy, a result that respondents find "unpalatable." Brief for Respondents 27. But our holding today has no bearing on the problem of individual bankruptcy, which we have no reason to address in this case. As we have stated, a corporation, as an inanimate entity, must act through agents. See *supra*, at 348, 105 S.Ct. at 1990. When the corporation is solvent, the agent that controls the corporate attorney-client privilege is the corporation's management. Under our holding today, this power passes to the trustee because the trustee's functions are more closely analogous to those of management outside of bankruptcy than are the functions of the debtor's directors. *An individual, in contrast, can act for himself*; there is no "management" that controls a solvent individual's attorney-client privilege. If control over that privilege passes to a trustee, it must be under some theory different from the one that we embrace in this case.

*Id.* at 356–57, 105 S.Ct. at 1995 (emphasis added).

Here, there is no individual who can act for himself because he has left the jurisdiction. Thus, he cannot assert the privilege or waive it. I believe, in these extraordinary circumstances, the trustee should have the privilege.[7] The trustee is the person empowered to administer the estate for the benefit of creditors. The trustee is the financial "alter ego" of the debtor and the records in question are necessary for the trustee to administer a bankruptcy estate which the debtor has abandoned.

There can be no real question raised as to the clear need that the trustee has for the business records of the debtor in the administration of the estate nor as to his authorization under the Bankruptcy Code to take custody and control of such records. A chapter 7 trustee is the representative of the bankruptcy estate pursuant to § 323(a) of the Bankruptcy Code. As such the trustee is entitled to the property of the estate wherever located and by whomever held under § 541(a) of the Code. Property of the estate under § 541 is broadly defined and includes all types of property including tangible or intangible property.

The Bankruptcy Code provides for certain duties of a debtor in a bankruptcy case that are pertinent here. Section 521 of the Code requires the filing of a list of creditors and a schedule of all assets and liabilities in addition to other disclosures regarding the debtor's financial affairs. Section 521(4) specifically provides that the debtor has a duty to "surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to the property of the estate" and further provides that this duty exists whether or not immunity is granted under § 344 of the Code. Subsection (3) of section 521 provides that a debtor is required to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties" under the Bankruptcy Code.

Section 542(e) of the Bankruptcy Code provides that the Court may order any attorney or other person in possession of "recorded information concerning a bankruptcy estate, including books, documents,

---

6. See also *In re O.P.M. Leasing Serv., Inc.,* 13 B.R. 64, 68 (S.D.N.Y.1981), *aff'd,* 670 F.2d 383 (2d Cir.1982): "To deny the trustee access to confidential information in the possession of the former counsel by permitting such shareholders the right to assert the privilege would result in the debtor's privilege being used against its own interests and obstruct the trustee's statutory duties to investigate and manage the affairs of the debtor."

7. The trustee should waive the privilege on the request of others only if it will benefit the trustee in its statutory duties. Thus, for example, the trustee would not be expected to waive the privilege for the benefit of law enforcement officials. See *In re Grand Jury Subpoena to Attorney Under Seal,* 679 F.Supp. 1403 (N.D.W.Va.1988).

records and papers, relating to the debtor's property or financial affairs" to turn over such information or documents to the trustee.

The § 542(e) turnover power with regard to books and records of a debtor's business is made expressly subject to "any applicable privilege" but it is my conclusion in the present case that the applicable privilege, i.e., the attorney-client privilege here asserted, is on the unique facts of this case held by the trustee in bankruptcy and that the privilege has been waived by the trustee in seeking turnover of the records in question.[8] That being the case there is no further justification for respondents to refuse production of the records and an order directing such production will be entered.

## ALTERNATIVE GROUND FOR DECISION

■ While the foregoing discussion and conclusions relating to waiver of the attorney-client privilege is sufficient to dispose of the pending motion for turnover of documents, the Court for purposes of judicial economy, in the event of any appeal, will also consider the further contentions of the respondents under the assumption—for present purposes only—that the attorney-client privilege has not been waived. Those further contentions depend upon a showing by the respondents that the debtor would have been able to assert a valid Fifth Amendment privilege against turnover of the documents to the trustee in bankruptcy had the debtor remained in possession of the documents and was presented with a turnover demand by the trustee.

### A. The Early Cases

In the appeal decided in *Matter of Harris*, 221 U.S. 274, 31 S.Ct. 557, 55 L.Ed. 732 (1911), the District Court had entered an order directing a bankrupt to deposit his books of account in a certain location affording the bankruptcy receiver free opportunity to inspect them but limiting the receiver to their use "only for the purpose for the civil administration of the estate and not for any criminal proceeding." The order further provided that in the event any subpoena or other process was directed to the receiver for the production of the records he should notify the court to the end that the bankrupt might have an opportunity to raise the question of his constitutional privilege under the Fifth Amendment. The bankrupt petitioned the Circuit Court of Appeals to revise the order and that court certified a question to the Supreme Court as to whether the order was a proper exercise of the authority of the bankruptcy court.

The Supreme Court in *Harris* answered the certified question in the affirmative and in a unanimous opinion written by Justice Holmes stated as follows:

If the order to the bankrupt, standing alone, infringed his constitutional rights,

---

**8.** As indicated above the Supreme Court in the *Weintraub* case left open the question of whether control of the attorney-client privilege passed to a trustee in bankruptcy involving an individual debtor and noted that if the privilege did so pass "it must be under some theory different from" the theory embraced in that decision. In the present case the debtor has absconded and in effect has placed himself outside of the law. It is not even known whether the debtor is still alive or is dead. The debtor has left an estate in rem which needs to be properly administered and the records in question are necessary to that administration. The records are property of the bankruptcy estate. Considering all of the foregoing, and primarily the absolute necessity for the trustee to have access to the business records of this debtor to properly administer the estate in the absence of the debtor to aid in that effort, I believe that we have here "some other theory" which amply justifies the passing of

control of the attorney-client privilege to the trustee in bankruptcy in this case. I am also comforted by the fact that the Courts of Appeals for this Circuit and the Second Circuit have spoken to the need to confine the privilege within narrow limits and that it may yield to important conflicting public policy. See *In re Horowitz*, 482 F.2d 72, 81 (2nd Cir.1973) ("But the privilege stands in derogation of the public's 'right to every man's evidence', 8 Wigmore, *supra*, § 2192, at 70, and as 'an obstacle to the investigation of the truth,' *id*, § 229.1, at 554; thus, as Wigmore has said, 'It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.' *Id.*"); *United States v. Goldberger*, 935 F.2d 501, 504 (2nd Cir.1991) ("The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose.").

it might be true that the provisions intended to save them would be inadequate and that nothing short of statutory immunity would suffice. But no constitutional rights are touched. The question is not of testimony but of surrender—not of compelling the bankrupt to be a witness against himself in a criminal case, present or future, but of compelling him to yield possession of property that he no longer is entitled to keep. If a trustee had been appointed, the title to the books would have vested in him by the express terms of § 70, and the bankrupt could not have withheld possession of what he no longer owned, on the ground that otherwise he might be punished. That is one of the misfortunes of bankruptcy if it follows a crime. The right not to be compelled to be a witness against oneself is not a right to appropriate property that may tell one's story. As the bankruptcy court could have enforced title in favor of the trustee it could enforce possession *ad interim* in favor of the receiver. § 2. In the properly careful provision to protect him from use of the books in aid of prosecution the bankrupt got all that he could ask.

221 U.S. at 279–280, 31 S.Ct. at 558.

Several years later, in the appeal decided in *Johnson v. United States*, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913), the bankrupt had been convicted for concealing money from the trustee in bankruptcy. The appeal questioned whether his business books and records were properly admitted against him. The books in question had been transferred to the trustee in accordance with section 70 of the Bankruptcy Act of 1898 and were produced before the grand jury and before the trial jury.

The Supreme Court affirmed the conviction in *Johnson* noting that the *Harris* decision established that the transfer of the bankrupt's books to the trustee lawfully could be required. With regard to the appellant's argument that the *Harris* decision referred to "the properly careful provision [in the order entered below] to protect [the bankrupt] from use of the books in aid of prosecution" the Supreme Court in an opinion again written by Justice Holmes for a unanimous court stated:

Courts proceed step by step. And we now have to consider whether the cautious statement in the former case marked the limit of the law in a case where no rights, if there were any, were saved when the books were transferred. The answer was implied in that decision. A party is privileged from producing the evidence but not from its production. The transfer by bankruptcy is no different from transfer by execution of a volume with a confession written on the fly leaf. It is held that a criminal cannot protect himself by getting the legal title to corporate books. *Wheeler v. United States*, 226 U.S. 478 [33 S.Ct. 158, 57 L.Ed. 309 (1913)]. But the converse proposition is by no means true, that he may keep the protection from the introduction of documentary evidence that he would have had while he retained it, after the title and possession have gone to some one else.

It is true that the transfer of the books may have been against the defendant's will, but it is compelled by the law as a necessary incident to the distribution of his property, not in order to obtain criminal evidence against him. Of course a man cannot protect his property from being used to pay his debts by attaching to it a disclosure of crime. If the documentary confession comes to a third hand *alio intuitu*, as this did, the use of it in court does not compel the defendant to be a witness against himself.

228 U.S. at 458–59, 33 S.Ct. at 572.

In *Ex Parte Fuller*, 262 U.S. 91, 43 S.Ct. 496, 67 L.Ed. 881 (1923) the lower court had entered an order directing the bankrupt to turn over books of accounts and other business records and documents to the trustee in bankruptcy, and upon discovering that certain books and papers were in the possession of the attorneys for the bankrupt entered a further order directing that those records also be turned over to the trustee in bankruptcy. The records in fact were turned over and subsequently were subpoenaed by a state prosecutor who introduced them into evidence in

a state criminal proceeding. The lower federal court granted a stay of its own orders pending an appeal to the Supreme Court and the state criminal court judge adjourned the criminal trial pending ruling on the lawfulness of the federal bankruptcy court orders. The matter decided in *Ex Parte Fuller* was an application for a continuing stay of the lower federal court's orders pending the appeal.

The Supreme Court in *Fuller* denied the application for stay and presumably the appeal became moot when the criminal proceeding resumed. In the decision in *Fuller* the Supreme Court commented:

A man who becomes a bankrupt or who is brought into a bankruptcy court has no right to delay the legal transfer of the possession and title of any of his property to the officers appointed by law for its custody or for its disposition, on the ground that the transfer of such property will carry with it incriminating evidence against him. His property and its possession pass from him by operation and due proceedings of law, and when control and possession have passed from him, he has no constitutional right to prevent its use for any legitimate purpose. His privilege secured to him by the Fourth and Fifth Amendments to the Constitution is that of refusing himself to produce, as incriminating evidence against him, anything which he owns or has in his possession and control, but his privilege in respect to what was his and in his custody ceases on a transfer of the control and possession which takes place by legal proceedings and in pursuance of the rights of others, even though such transfer may bring the property into the ownership or control of one properly subject to subpoena *duces tecum*. These conclusions follow from the principles announced by this Court in the *Matter of Harris*, 221 U.S. 274, 279 [31 S.Ct. at 558], and *Johnson v. United States*, 228 U.S. 457 [33 S.Ct. at 572]. ... The Receiver, the bankrupts and their attorney must yield possession and title to the Trustee. Neither can accompany the delivery he is bound by law to make with any effective conditions restricting use of the books, papers or other property of the bankrupts' estate as evidence against them.

262 U.S. at 93–94, 43 S.Ct. at 497.

## B. The Later Cases

The respondent law firm argues however that the *Harris–Johnson–Fuller* line of decisions is no longer applicable and cites *In re Connelly*, 59 B.R. 421, 437 (Bankr.N.D.Ill.1986), for that proposition. The Court in the *Connelly* decision did express that view but I cannot agree with that view because all the other case law development is to the contrary.

In the *Connelly* case itself the bankruptcy judge did not finally determine that vital records necessary for the administration of the estate would not be ordered to be turned over to the trustee, but simply provided for a further procedure with regard detailed assertions as to the privilege as it might apply to particular items.

Where the issue has been squarely presented, and decided, the decisions are uniform requiring turnover of necessary books and records of a business bankrupt essential to the administration of the bankruptcy estate notwithstanding Fifth Amendment claims. See, *In re Crabtree*, 39 B.R. 726, 728–731 (Bankr.E.D.Tenn. 1984); *In re Devereaux*, 48 B.R. 644 (Bankr.S.D.Cal.1985); *In re Krisle*, 54 B.R. 330, 338–340 (Bankr.D.S.D.1985). In all of these cases the bankruptcy courts relied upon the *Harris–Johnson–Fuller* line of decisions in ordering turnover of assets and/or books and records of business bankrupt notwithstanding Fifth Amendment privilege claims.

The Supreme Court itself has continued to cite that early line of decisions with approval. In addition to the *Bouknight* decision referred to above, the Court in *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), reiterated that "the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to the information that may

incriminate him" and cited the *Johnson* decision for support of that proposition.[9]

The most important later decision relying on the early cases of course is the *Bouknight* decision—handed down by the Supreme Court in 1990—which will be examined in more detail below.

### C. The "Testimonial" Decisions

While I believe that the *Connelly* court incorrectly reads the *Harris–Johnson–Fuller* line of decisions as being bottomed solely upon a property right and/or privacy rationale, Judge Schmetterer in that decision does validly point out that the Supreme Court's decision in *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), raises some additional questions regarding the turnover of business books and records in a bankruptcy proceeding.

The *Fisher* case did not involve a bankrupt but instead a tax payer, Fisher, who had transferred various workpapers prepared by his accountants to attorneys that were retained to assist the taxpayer in connection with an IRS investigation. The documents had been transferred to the attorneys for the purpose of obtaining legal advice. The attorney-client privilege was asserted and the Court therefore considered the underlying question as to whether the documents could have been obtained by a summons addressed to the taxpayer while the documents were still in his possession. The Court held on those facts that enforcing the summons for production of the work papers would not involve any incriminating compelled "testimony" by the taxpayer within the protection of the Fifth Amendment.

While the Supreme Court in *Fisher* sustained the turnover of the documents in question, it did establish in dicta the "act of production/testimonial" rationale whereby the very fact of producing documents by a prospective criminal defendant could have communicative and testimonial effect

which would be within the Fifth Amendment privilege. As the court commented in its *Fisher* decision:

A subpoena served on a taxpayer requiring him to produce an accountant's workpapers in his possession without doubt involves substantial compulsion. But it does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought. Therefore, the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for the privilege protects a person only against being incriminated by his own compelled testimonial communications. *Schmerber v. California, supra* [384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)]; *United States v. Wade, supra* [388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)]; and *Gilbert v. California, supra* [388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967)]. The accountant's workpapers are not the taxpayer's. They were not prepared by the taxpayer, and they contain no testimonial declarations by him. Furthermore, as far as this record demonstrates, the preparation of all of the papers sought in these cases was wholly voluntary, and they cannot be said to contain compelled testimonial evidence, either of the taxpayers or of anyone else. The taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else.

The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the

---

**9.** The Supreme Court reiterated forcefully in *United States v. Doe,* 465 U.S. 605, 610–11, 617, 104 S.Ct. 1237, 1241, 1244, 79 L.Ed.2d 552 (1984), that the *contents* of documents and

records are *never* privileged under the Fifth Amendment. See particularly note 18, 465 U.S. at 617, 104 S.Ct. at 1245.

papers are those described in the subpoena. *Curcio v. United States,* 354 U.S. 118, 125 [77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225] (1957). The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the taxpayer are both "testimonial" and "incriminating" for purposes of applying the Fifth Amendment. These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof.

\*    \*    \*    \*    \*    \*

It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment. The papers belong to the accountant, were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his client. Surely the Government is in no way relying on the "truthtelling" of the taxpayer to prove the existence of or his access to the documents. 8 Wigmore § 2264, p. 380. The existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers. Under these circumstances by enforcement of the summons "no constitutional rights are touched. The question is not of testimony but of surrender." *In re Harris,* 221 U.S. 274, 279 [31 S.Ct. 557, 558, 55 L.Ed. 732] (1911).

\*    \*    \*    \*    \*    \*

This Court has also time and again allowed subpoenas against the custodian of corporate documents or those belonging to other collective entities such as unions and partnerships and those of bankrupt businesses over claims that the documents will incriminate the custodian despite the fact that producing the documents tacitly admits their existence and their location in the hands of their possessor. *E.g., Wilson v. United States,* 221 U.S. 361 [31 S.Ct. 538, 55 L.Ed. 771] (1911); *Dreier v. United States,* 221 U.S. 394 [31 S.Ct. 550, 55 L.Ed. 784] (1911); *United States v. White,* 322 U.S. 694 [64 S.Ct. 1248, 88 L.Ed. 1542] (1944); *Bellis v. United States,* 417 U.S. 85 [94 S.Ct. 2179, 40 L.Ed.2d 678] (1974); *In re Harris, supra.* The existence and possession or control of the subpoenaed documents being no more in issue here than in the above cases, the summons is equally enforceable.

\*    \*    \*    \*    \*    \*

Without more, responding to the subpoena in the circumstances before us would not appear to represent a substantial threat of self-incrimination. Moreover, in *Wilson v. United States, supra; Dreier v. United States, supra; United States v. White, supra; Bellis v. United States, supra;* and *In re Harris, supra,* the custodian of corporate, union, or partnership books or those of a bankrupt business was ordered to respond to a subpoena for the business' books even though doing so involved a "representation that the documents produced are those demanded by the subpoena," *Curcio v. United States,* 354 U.S., at 125 [77 S.Ct. at 1150].

\*    \*    \*    \*    \*    \*

425 U.S. at 409–410, 411–413, 96 S.Ct. at 1580–81, 1581–82.

The foregoing testimonial rationale, while mere dicta in terms of the actual decision in the *Fisher* case, has been applied by the lower courts since 1976—but not without noting evident problems if the "testimonial" analysis is pushed to its logical limits.[10] The Court of Appeals for the

---

**10.** The problems in applying the *Fisher* rationale to production of documents was noted in *In re Connelly,* 59 B.R. 421, 439 (Bankr.N.D.Ill.1986), as follows:

    Whether the implied admissions a witness makes by producing documentary evidence will be both "testimonial" and "incriminating" does not lend itself to a categorical answer. That depends on the facts and circumstances of the particular case. *Fisher v. United States,* 425 U.S. 391, 410, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39 (1976). One commentator has in turn stated "the Supreme Court's standard for suppression is so dubious and difficult to ap-

First Circuit in *In re Grand Jury Proceedings*, 626 F.2d 1051 (1st Cir.1980), dealing with a case in which a physician was subpoenaed to turn over his appointment logs to a grand jury, commented:

> The line of cases culminating in *Fisher* have stripped the content of business records of any Fifth Amendment protection; such protection is afforded only to the testimonial content of the act of turning over the records under compulsion. Compliance with the subpoena may admit certain facts, such as the existence of the requested documents, which in most cases will be so trivial that the Constitution is not implicated. In many cases, however, the authentication of the document, which may be proven by an official's testimony that he received them from the individual who prepared and possessed them, will provide a necessary link to incriminating evidence contained in the documents. *See United States v. Plesons*, 560 F.2d 890, 893 (8th Cir.) *cert. denied*, 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 452 (1977).
>
> \*   \*   \*   \*   \*   \*
>
> Our difficulty has not been with identifying the existence of the doctor's privilege, but with fashioning a remedy that would secure to him his right without preventing the government from gaining access to the records' contents, in which he has no constitutionally protected interest. Harmonizing the government's right of lawful access to the contents of personal business records with the possessor's right not to have the testimonial implications of his submission used against him has proven to be the most perplexing aspect of applying *Fisher*. Some courts seem to allow invocation of the Fifth Amendment to defeat entirely a subpoena addressed to the owner and possessor of personal business records. *See United States v. Beattie*, 541 F.2d 329 (2d Cir.1976); *United States v. Helina*, 549 F.2d 713 (9th Cir.1977). Other courts have discounted the significance of compelled authentication and have al-

lowed the government to subpoena the records, at least in certain circumstances, without requiring any safeguards for the witness. *See United States v. Authement*, 607 F.2d 1129, 1131–32 (5th Cir. 1979) (per curiam); *Witte v. United States*, 544 F.2d 1026 (9th Cir.1976); *Fagan v. United States*, 545 F.2d 1005, 1007 (5th Cir.1977) (dictum).

Entirely to prohibit grand jury subpoena of business records in order to vindicate an individual's right not to have authentication evidence compelled would create an anomalous framework of constitutional protection of business records. *See* Note, *Developments in the Law— Corporate Crime; Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1276–86 (1979). Corporate records may be subpoenaed, even when incriminating to the custodian; so may personal business records when not in the possession of the owner; so may records of a sole practitioner when the records were prepared by a third party. Only the personal self-created business records in the possession of a sole proprietor or practitioner would enjoy a privilege against subpoena, although the records themselves are indistinguishable from business records that may be subpoenaed. Such records, enjoying protection only because of the form of business organization chosen by their creator, could, nonetheless, be seized from the proprietor's desk by police executing a valid warrant. Such a rule would create an exempt category of records for no reason related to the character of the records, and prevent the lesser intrusion of subpoena while permitting the greater intrusion of search and seizure. The framework would be erected to protect against compelled disclosure of the authenticity of the records, to the establishment of which fact both the individual and the government will often be indifferent as a practical matter because of remaining untainted evidence

---

ply that *Fisher* has produced utter confusion in the lower courts [and its] practical effect has largely been nullified". R. Heidt, The

*Fifth Amendment Privilege and Documents— Cutting Fisher's Tangled Line*, 49 Mo.L.Rev. 439, 443, 443 n. 14 (Summer, 1984).

of the same fact. The remedy thus afforded would be an irrational hole in the constitutional system of regulation of crime detection and would provide the individual with a remedy far exceeding the scope of his constitutional privilege.

626 F.2d at 1055, 1056.

The Court of Appeals remanded the case, rather than affirming or reversing the issue of the subpoena in question, to permit the parties and the lower court to consider whether the granting of use immunity with regard to the document in question might be appropriate. 626 F.2d at 1058.[11]

It should be noted in passing that the Supreme Court in the *Fisher* decision (in the passage quoted above) itself cites and reaffirms its prior decisions with regard to turnover of business books and records by bankrupts among others. However Judge Schmetterer in *Connelly* notes the logical conflict if the testimonial rationale of *Fisher* is pushed to its limits:

> Debtor's attorneys have in memoranda recognized that turnover of property of the estate is not considered testimonial. Without question, extending a debtor's Fifth Amendment privilege to block turnovers of estate property could severely, if not completely, obstruct the administration of bankruptcy estates. However, this question must be posed: If the existence and the debtor's possession and control of property of the estate is unknown or disputed, could the debtor make a colorable claim that the act of producing such property is privileged?

Two footnotes in *Fisher v. United States* lend some support to such an argument. That decision did suggest there is no distinction for Fifth Amendment purposes between producing a document or a chattel, and in either case the act of production may be compelled and testimonial. *Fisher v. United States*, 425

U.S. at 410 n. 11, 412 n. 12, 96 S.Ct. at 1580 n. 11, 1582 n. 12.

59 B.R. at 443-444.

This of course is the nub of the problem presented to the Court in the case at bar. If an asset is unknown to the trustee, and is not reflected in the books and records that he presently possesses, and a disposition of that asset by the debtor was in some way unlawful, the production of the record would logically be communicative and testimonial on the part of the debtor. The same would be true with regard to causes of action that may be reflected in the debtor's records and which might also involve unlawful transactions on his part. On the other hand, knowledge of such assets is imperative if the trustee is to fulfill his statutory duties under the Bankruptcy Code to liquidate all assets and distribute the proceeds to the creditors. There is a way out of this conundrum however, which can give appropriate effect to the *Fisher* decision, and still honor the case law dealing with conflicting statutory disclosure requirements. The evolving law in that regard is the subject of the next section of this opinion.

### D. The "Balancing" Decisions

█ The resolution of the conundrum mentioned above is to simply recognize that there are some regulatory disclosure requirements in modern society that have to be complied with even though there may in fact be some incidental incriminating effects upon the party required to comply— provided that the regulatory requirements in question are strictly noncriminal in nature and have general applicability throughout the society. That is essentially what the Supreme Court did in *Baltimore City Dept. of Social Serv. v. Bouknight*, 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990), as indicated above, in which the Supreme Court recognized that the act of producing the child in question would itself have testimonial effect which could be in-

---

**11.** The Court of Appeals first considered whether the courts might create an exclusionary rule to prevent government use in any way of the fact that the individual complied with a subpoena, but ultimately concluded that such judicial-

created immunity would not be appropriate. This position was subsequently taken by the Supreme Court in *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984).

criminating but nevertheless would be required.

The Supreme Court in reaching its decision in *Bouknight* noted that a number of its prior decisions had required production of documents or other items that could have incriminating effects, including the cases involving turnover of bankrupt business records, and commented:

The possibility that a production order will compel testimonial assertion that may prove incriminating does not, in all contexts, justify invoking the privilege to resist production. See *infra,* [110 S.Ct.] at 911–913. Even assuming that this limited testimonial assertion is sufficiently incriminating and "sufficiently testimonial for purposes of the privilege," *Fisher, supra,* [425 U.S.] at 411, 96 S.Ct., at 1581, Bouknight may not invoke the privilege to resist the production order because she has assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime.

The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws. In *Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), the Court considered an application of the Emergency Price Control Act and a regulation issued thereunder which required licensed businesses to maintain records and make them available for inspection by administrators. The Court indicated that no Fifth Amendment protection attached to production of the "required records," which the " 'defendant was required to keep, not for his private uses but for the benefit of the public, and for public inspection.' " *Id.* at 17–18, 68 S.Ct., at 1384–1385 (quoting *Wilson v. United States,* 221 U.S. 361, 381, 31 S.Ct. 538, 544, 55 L.Ed. 771 (1911)).

\*   \*   \*   \*   \*   \*

See also *In re Harris,* 221 U.S. 274, 279, 31 S.Ct. 557, 558, 55 L.Ed. 732 (1911) (Holmes, J.) (regarding a court order that a bankrupt produce account books, "[t]he question is not of testimony but of surrender—not of compelling the bankrupt to be a witness against himself in a criminal case, past or future, but of compelling him to yield possession of property that he no longer is entitled to keep"). The Court has since refined those limits to the government's authority to gain access to items or information vested with this public character. The Court has noted that "the requirements at issue in *Shapiro* were imposed in 'an essentially non-criminal and regulatory area of inquiry,' " and that *Shapiro's* reach is limited where requirements "are directed to a 'selective group inherently suspect of criminal activities.' " *Marchetti v. United States,* 390 U.S. 39, 57, 88 S.Ct. 697, 707, 19 L.Ed.2d 889 (1968)....

\*   \*   \*   \*   \*   \*

*California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), confirms that the ability to invoke the privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement. In *Byers,* the Court upheld enforcement of California's statutory requirement that drivers of cars involved in accidents stop and provide their names and addresses. A plurality found the risk of incrimination too insubstantial to implicate the Fifth Amendment, *id.,* at 427–428, 91 S.Ct., at 1537–1538, and noted that the statute "was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities," *id.,* at 430, 91 S.Ct., at 1539, was " 'directed at the public at large,' " *ibid.* (quoting *Albertson v. Subversive Activities Control Board, supra,* 382 U.S. [70], at 79, 86 S.Ct. [194], at 199 [15 L.Ed.2d 165 (1965) ] ) and required disclosure of no inherently illegal activity. See also *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (rejecting Fifth Amendment objection to requirement to file income tax return). Justice Harlan, the author

of *Marchetti, Grosso* [*v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968)], and *Haynes* [*v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968)], concurred in the judgment. He distinguished those three cases as considering statutory schemes that "focused almost exclusively on conduct which was criminal," 402 U.S., at 454, 91 S.Ct., at 1551. While acknowledging that in particular cases the California statute would compel incriminating testimony, he concluded that the noncriminal purpose and the general applicability of the reporting requirement demanded compliance even in such cases. *Id.,* [402 U.S.] at 458, 91 S.Ct., at 1553.

\* \* \* \* \* \*

These principles readily apply to this case. Once Maurice was adjudicated a child in need of assistance, his care and safety became the particular object of the State's regulatory interests. See [*In re Maurice M.*], 314 Md. [391], at 404, 550 A.2d [1135], at 1141 [(1988)]; Md. Cts. & Jud.Proc.Code Ann. §§ 3–801(e), 3–804(a) (Supp.1989); see also App. 105 ("This court has jurisdiction to require at all times to know the whereabouts of the minor child. We asserted jurisdiction over that child in the spring of 1987 . . .").

\* \* \* \* \* \*

Even when criminal conduct may exist, the court may properly request production and return of the child, and enforce that request through exercise of the contempt power, for reasons related entirely to the child's wellbeing and through measures unrelated to criminal law enforcement or investigation. See Maryland Cts. & Jud.Proc.Code Ann. § 3–841(c) (1984). This case provides an illustration: concern for the child's safety underlay the efforts to gain access to and then compel production of Maurice. See App. 33–39, 53–55, 150, 155–158; see also 314 Md., at 419, 550 A.2d, at 1149 (McAuliffe, J., dissenting). Finally, production in the vast majority of cases will embody no incriminating testimony, even if in particular cases the act of production may incriminate the custodian through an assertion of possession, the existence, or the identity of the child. Cf. *Byers,* 402 U.S., at 430–431, 91 S.Ct., at 1539; *id.,* at 458, 91 S.Ct., at 1553 (Harlan, J., concurring in judgment).

\* \* \* \* \* \*

We are not called upon to define the precise limitations that may exist upon the State's ability to use the testimonial aspect of Bouknight's act of production in subsequent criminal proceedings. But we note that imposition of such limitations is not foreclosed. The same custodial role that limited the ability to resist the production order may give rise to corresponding limitations upon the direct and indirect use of that testimony. See *Braswell* [*v. United States*], 487 U.S. [99], at 118, and n. 11, 108 S.Ct. [2284], at 2295, and n. 11 [101 L.Ed.2d 98 (1988)]. 110 S.Ct. at 905–908.

It should also be noted, as set forth in the first paragraph quoted above, that the Supreme Court in *Bouknight* explicitly recognizes the need to balance the testimonial rationale of *Fisher* with the requirement of production "as part of a noncriminal regulatory regime." In the case before this Court the disclosure is required as part of a noncriminal statutory scheme for administration of bankruptcy estates which requires such disclosure for liquidation of the same and in no sense is aimed particularly at prospective criminal defendants.

Another recent instance in which both the attorney-client privilege and the Fifth Amendment privilege had to yield to statutory reporting requirements appears in *United States v. Goldberger,* 935 F.2d 501 (2d Cir.1991), holding valid the 26 U.S.C. § 6050I provision requiring reporting of cash transactions in excess of $10,000 even as applied to a fee paid by the appellant Goldberger to his attorney. The Court there stated:

Appellants' allegations of unconstitutionality merit only brief discussion. Their contentions relative to the Fourth and Fifth Amendments have been rejected consistently in cases under the Bank Secrecy Act by both the Supreme Court

and this court. See *United States v. Miller*, 425 U.S. 435, 444, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976); *California Bankers [Ass'n v. Shultz], supra*, 416 U.S. [21] at 44–75, 94 S.Ct. [1494] at 1509–24 [39 L.Ed.2d 812 (1974)]; *United States v. Mickens*, 926 F.2d 1323, 1330–32 (2d Cir.1991); *United States v. Dichne*, 612 F.2d 632, 638–41 (2d Cir. 1979), cert. denied, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980); see also *Couch v. United States*, 409 U.S. 322, 327–28, 93 S.Ct. 611, 615–16, 34 L.Ed.2d 548 (1973); *Matter of Grand Jury Empanelled February 14, 1978*, 603 F.2d 469, 472–73 n. 3 (3d Cir.1979). The reporting requirements of the 1984 Tax Reform Act, like those of the Bank Secrecy Act, target transactions without regard to the purposes underlying them and do not require reporting of information that necessarily would be criminal. See *United States v. Mickens, supra*, 926 F.2d at 1331.

935 F.2d at 503.

### E. Conclusion/Fifth Amendment

The Court will conclude as an alternative ground for its decision that compelling production of the documents in question, even if there were no waiver of the attorney-client privilege, is still warranted on the facts of this case notwithstanding possible incriminating effects upon the debtor from some of those documents. In my opinion had the documents still been in the possession of the debtor at the time of the bankruptcy this court could have validly ordered the debtor to produce the same to the trustee in bankruptcy under the *Harris–Johnson–Fuller* line of decisions which I believe have not been abrogated by the *Fisher* decision but instead have continued validity

under the balancing rationale used in the *Bouknight* decision by the Supreme Court.

It cannot be said that the Bankruptcy Code provides a regulatory or investigative regime designed to ferret out prospective criminal defendants. Under chapter 7 of the Code there is a statutory liquidation procedure of general applicability which depends upon, and requires full disclosure by the debtors involved in such proceedings. On the other hand, it can be said that liquidation of business cases under chapter 7 of the Code would be severely hampered, if not rendered impossible, were the bankruptcy debtor able to withhold from the trustee the books and records of the business on grounds of possible incriminatory effects as to certain of those records.

It should be noted that while the present case is an involuntary bankruptcy the rationale and arguments put forth by the respondent law firm in this case would be equally applicable to a voluntary chapter 7 proceeding in which the debtor claims a discharge from his liabilities. Unlike the situation under the prior Bankruptcy Act, a voluntary debtor under the present Bankruptcy Code cannot be denied his discharge because he invokes his privilege against self-incrimination as to questions concerning the assets and liabilities of the estate unless he is granted immunity with regard to such disclosures.[12] *Bankruptcy Code*, 726(a)(6). It certainly would be an irrational spectacle to have an individual come into the bankruptcy courts and obtain a discharge from his liabilities without ever disclosing his assets on the grounds of self-incrimination.

The efforts by the court in *Connelly* to work around this "horrible" prospect, while laudable, do not appear to me to be realistic. Requiring a debtor to assert the Fifth Amendment privilege in any detail item by item is not practical in my judg-

12. With regard to the question of immunity and the pending state criminal proceeding, bankruptcy courts have the statutory power to grant use immunity to persons required to provide information in a bankruptcy case. 11 U.S.C. § 344; 18 U.S.C § 6001 *et seq.* This circuit has held that any such immunity granted insulates the person given the immunity from state prosecution based on the information disclosed. *In re Bianchi*, 542 F.2d 98 (1st Cir.1976). But even

while the Court might consider an order prohibiting use of the disclosed records against the debtor in the state prosecution, it cannot act *sua sponte* but only upon request of the United States attorney. 18 U.S.C. § 6003(a); *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *United States v. Davis*, 623 F.2d 188 (1st Cir.1980). As there has been no request by the United States attorney for a grant of immunity, there can be none for this debtor.

ment since the "item by item" approach dealing with assets and transfers would in effect improperly pressure disclosure violating the Fifth Amendment privilege if pursued literally. If an asset is concealed or otherwise unknown to the trustee, and the debtor refuses to answer questions with regard to his assets on grounds of self-incrimination, it is difficult for this Court to see how the trustee or the Court can get behind that assertion. If the debtor does not have to produce his business records, and he is asked whether he has any records indicating other assets, or knows of any other assets, and responds with an invocation of the Fifth Amendment on grounds of a possible self-incrimination that normally will end the matter. Thus, if the respondent law firm's contentions are correct, the "horrible" set forth above indeed is a realistic concern.

Based on a review of all of the cases discussed under this alternative ground for decision I conclude that any refusal by the debtor to produce the books and records of his business operation if those records were still in his possession would not be privileged under the Fifth Amendment and that the trustee in bankruptcy would be entitled to production of the same.

### GENERAL CONCLUSION

Based on the foregoing analysis and consideration of the relevant case decisions this Court concludes that the attorney-client privilege asserted by the respondent law firm has been waived by the person presently holding that privilege and, alternatively, that even without a waiver of that privilege the privilege does not lie inasmuch as the documents in question would not be privileged from production or disclosure if they were still in the possession of the debtor. An order requiring the turnover of the documents will be entered separately. In view of the nature of issues presented, and the important privileges involved, the order will be stayed automatically in the event of any appeal from this decision.